UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEIVY JOSE RODRIGUEZ DELGADO,<br><br>Defendant. | Criminal Action No. 22-304 (JEB) |

### MEMORANDUM OPINION

In July 2022, Deivy Jose Rodriguez Delgado allegedly perpetrated three separate hostage takings in the Dominican Republic with the help of an accomplice. He is accused of using a dating application to lure the victims into meeting for a date and then getting into his car. In all three instances, Defendant allegedly stopped to let his accomplice into the backseat after a short drive, at which point they held each victim at knifepoint and demanded ransom for their release. In addition to three counts of hostage taking, Delgado is also charged with conspiracy to commit those acts. With trial beginning next week, he moves to suppress evidence obtained in a search of his residence and vehicle in the Dominican Republic. He also moves to sever the Indictment's four counts from each other and requests that the Court order separate trials on each of them. The Court will deny both Motions, but it will allow Defendant to renew the Motion to Sever during trial as the need arises.

**I.     Background**

In May 2023, a grand jury returned a four-count Superseding Indictment against Delgado, charging him with Conspiracy to Commit Hostage Taking, in violation of 18 U.S.C. § 1203(a)

1

(Count I), and three counts of Hostage Taking, also in violation of 18 U.S.C. § 1203(a) (Counts II–IV). See ECF No. 14 (Superseding Indictment).

At the outset, the Court briefly recounts the relevant facts of the three incidents and the investigation thereof. The crimes took place in the Dominican Republic between July 5 and July 30, 2022, under highly similar circumstances. See ECF No. 31 (Opp. to Severance) at 2–4, 13. According to the Government, Defendant first made contact with all three victims on a dating application called Grindr; his profile name was "Sebastian." Id. He picked each victim up in a vehicle on the pretense of going on a date. Id. Little did these victims know, an unwelcome third wheel was soon to join. After driving a short distance, Delgado stopped to let an accomplice into the car. Id. Upon crashing the supposed dates, the accomplice put the victims in a headlock from behind and threatened them with a knife while Defendant brandished his own knife. Id. Delgado then demanded ransom in exchange for the victims' release, instructing that the money be sent to a CashApp account under the name Geneitha Nettles. Id.

While bearing quite a resemblance to one another, the crimes were not identical. For instance, Defendant moved his conversation from Grindr to WhatsApp with two of the victims. Id. He drove different cars to pick his victims up, although the Government claims that he leased all three vehicles from the same person. Id. Only one victim had his hands zip-tied. Id. at 2. In addition, the Government does not assert that the crimes occurred at the same location within the Dominican Republic.

Following victim reports and a request from the FBI to take action regarding the hostage takings, Dominican authorities began an investigation in August 2022. See ECF Nos. 32-1 (Search Warrant) at 1; 32-2 (Investigation Report) at 1, 7. On September 9, 2023, a magistrate judge of the Dominican Pretrial Criminal Proceedings Court found "reasonable cause" to issue a

warrant for a search to take place at Delgado's residence in the Dominican Republic. See Warrant at 5–6. Although the scope of the authorized search is somewhat difficult to parse, it appears to define the residence as the "location in which [law enforcement] intend[s] to find and seize items related to the unlawful conduct," including "electronic devices" and "vehicles." Id. at 6. Dominican officials executed the Warrant on September 10, 2022, searching Defendant's apartment and a red Hyundai Elantra found in the apartment parking lot that had been linked to him by multiple witness reports. See ECF No. 32 (Opp. to Suppression) at 4–5; Investigative Report at 20–21. In the apartment, officials found, *inter alia*, an iPhone with a background picture that matched Delgado's Grindr profile picture, an insurance card for the Hyundai Elantra, and a key to — apparently — the same vehicle. See Opp. to Suppression at 4 & n.2; Investigative Report at 21. The search of the car yielded, among other pieces of evidence, two serrated knives. See Opp. to Suppression at 5; Investigative Report at 21. During the search, Dominican law enforcement arrested Delgado. See Investigative Report at 20–21.

Following Defendant's arrest, Dominican immigration officials ordered his deportation to Venezuela, his country of origin, in accordance with Dominican law. See ECF No. 28 (Mot. to Suppress) 3–4. Id. Instead of relocating him to Venezuela, however, and without informing him of his true destination, Dominican immigration agents brought him to Miami at the direction of the FBI. Id. Once Delgado was on American soil, FBI agents arrested him. Id. at 4.

**II.     Analysis**

In advance of trial, Delgado has filed a Motion to Suppress evidence obtained in the above-described search of his residence and vehicle. See Mot. to Suppress. In a separate Motion, he seeks to sever the Indictment's four counts such that they must be tried separately. See ECF No. 29 (Mot. to Sever). The Court addresses the Motions in that order.

A. <u>Motion to Suppress</u>

In moving to suppress seemingly all the evidence obtained during the search of his residence and vehicle in September 2022, Defendant relies on both the Fourth and Fifth Amendments. The Court will consider each in turn.

1. *Fourth Amendment*

Delgado's first attempt at suppression invokes the Fourth Amendment. While defendants are typically entitled to the exclusion of evidence obtained in violation of that Amendment, <u>Mapp v. Ohio</u>, 367 U.S. 643, 655–56 (1961), constitutional protections do not invariably extend to aliens, particularly those subjected to state action when outside of the United States. <u>See</u> <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 271 (1990) (collecting cases indicating that noncitizens "receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); <u>Zadvydas v. Davis</u>, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."). Relevant here, it is clearly established that "the Fourth Amendment has no application" to "a citizen and resident of [another country] with no voluntary attachment to the United States, [where] the place searched was located in [another country]." <u>Verdugo-Urquidez</u>, 494 U.S. at 274–75.

In addition, "the [Fourth Amendment's] exclusionary rule does not normally apply to foreign searches conducted by foreign officials," even of U.S. persons. <u>United States v. Mount</u>, 757 F.2d 1315, 1317 (D.C. Cir. 1985). Although the joint-venture doctrine creates an exception to that rule for situations in which "American officials or officers participated in some significant way" in the search, <u>id.</u> at 1318, defendants "not protected by the Fourth Amendment at the time

4

of their arrests . . . are not entitled to suppression . . . under [that] doctrine." United States v. Bourdet, 477 F. Supp. 2d 164, 177 (D.D.C. 2007).

As the foregoing suggests and as the Government correctly argues, the Fourth Amendment has no application to the search of Delgado's residence or vehicle. See Opp. to Suppression at 5–6. The search took place in the Dominican Republic, and Delgado was, at the time, a citizen of Venezuela residing in the Dominican Republic. Simply put, not only did he lack a "substantial connection with our country," he had no domestic connections to speak of, either voluntary or involuntary. Verdugo-Urquidez, 494 U.S. at 271–72; see id. at 274–75 (holding Fourth Amendment inapplicable to "a citizen and resident of Mexico with no voluntary attachment to the United States, [where] the place searched was located in Mexico"). Defendant, then, cannot argue that the search was unreasonable under the Fourth Amendment. Because the joint-venture doctrine offers no help to a defendant without Fourth Amendment rights at the time of search — even if American officials played a significant role, which is at least arguable here — that path to relief is similarly blocked. See Bourdet, 477 F. Supp. 2d at 177.

Delgado does not contend that Verdugo-Urquidez holds otherwise. In fact, he acknowledges that the case "appears to foreclose" any Fourth Amendment challenge to this search. See Mot. to Suppress at 5. Still, he raises two arguments for applying the Fourth Amendment in order to "preserve" the issue. Id. First, he suggests that Verdugo-Urquidez was wrongly decided. Id. (citing dissenting opinion). The Court will not entertain that frontal attack on binding precedent.

Second, Defendant argues that Verdugo-Urquidez has been undermined by a more recent Supreme Court decision, Boumediene v. Bush, 553 U.S. 723 (2008), which held that the Suspension Clause applies to individuals detained at Guantanamo Bay. See Mot. to Suppress at

5

5–7. He asserts that Boumediene cast aside Verdugo-Urquidez's "substantial connections" test in favor of one looking to the "particular circumstances, the practical necessities," and "whether judicial enforcement of the [constitutional] provision would be 'impracticable and anomalous.'" Boumediene, 553 U.S. at 759; Mot. to Suppress at 5–6. This is consequential, he says, because applying the Fourth Amendment to foreign searches like the one in this case would not be "anomalous" in light of "extensive evidence indicating that the Clause was originally understood to constrain U.S. government actions outside our territory." Mot. to Suppress at 6–7.

The Court is not convinced. Boumediene was primarily concerned with rejecting a formalistic rule that constitutional protections are categorically inapplicable where the United States lacks *de jure* sovereignty. See 553 U.S. at 764. The Boumediene Court thus explained that, where the United States "maintains *de facto* sovereignty over [a] territory" given "its complete jurisdiction and control" over it — as it does with Guantanamo Bay — the Constitution, as applied to foreign citizens, does not "necessarily stop[ ] where *de jure* sovereignty ends." Id. at 755; id. at 753 (taking note of uncontested *de facto* sovereignty over Guantanamo Bay). In light of Boumediene's relatively narrow geographic focus, the Court is unpersuaded that it overhauled the doctrine as it relates to those places, like the Dominican Republic, where the United States lacks all control.

What is more, the Court sees nothing in Boumediene casting general doubt on Verdugo-Urquidez. See Rasul v. Myers, 563 F.3d 527, 529 (D.C. Cir. 2009) ("[T]he Court in Boumediene disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions[] other than the Suspension Clause."). Indeed, following Boumediene, courts in this district have consistently relied on both the substantial-connections test in general, see, e.g., Zaidan v. Trump, 317 F. Supp. 3d 8, 28 (D.D.C. 2018); FBME Bank

6

Ltd. v. Lew, 209 F. Supp. 3d 299, 326 (D.D. C. 2016), and Verdugo-Urquidez's Fourth Amendment holding in particular.  See, e.g., Matter of Seizure & Search of Motor Yacht Tango, 597 F. Supp. 3d 149, 152 (D.D.C. 2022); Lopez Bello v. Smith, 651 F. Supp. 3d 20, 37 (D.D.C. 2022); United States v. Larrahondo, 885 F. Supp. 2d 209, 221 (D.D.C. 2012).  The Court will follow suit.

Finally, even if Boumediene shifted the calculus, as Delgado says, he identifies no Fourth Amendment problem with the search.  It was conducted pursuant to a warrant seemingly in accordance with Dominican law, which is all that is required of a search conducted by foreign officials acting in a joint venture with American law enforcement, assuming this even occurred. United States v. Ferguson, 508 F. Supp. 2d 1, 5 (D.D.C. 2007) ("If a joint venture is found to exist, the Court must then determine if foreign law has been complied with.").  The closest Defendant gets to finding fault with the search is his observation that officials searched Delgado's car "even though the authorized search was to find evidence 'inside the dwelling.'" Mot. to Suppress at 1.  This argument is difficult to assess because he does not attach or even describe the document from which he quotes.  In any event, as the Government notes, the Warrant itself appears to contemplate a search of vehicles found at Delgado's residence.  See Search Warrant at 6 (listing "vehicles" as evidence to be found at the residence); Opp. to Suppression at 4.  In sum, the Fourth Amendment does not apply and would not help Delgado even if it did.

2. *Fifth Amendment*

Defendant next requests suppression under the Fifth Amendment, which supplies an avenue to exclusion that exists even where a search or seizure is conducted by foreign officials. United States v. Barona, 56 F.3d 1087, 1091 (9th Cir. 1995); see also Ferguson, 508 F. Supp. 2d

7

at 4. Such a remedy is proper under the Fifth Amendment when "the circumstances of the foreign search and seizure are so extreme that they shock the judicial conscience." Id. (cleaned up); see Rochin v. California, 342 U.S. 165, 172 (1952). "[C]onduct does not shock the judicial conscience when it is 'simply illegal'; rather, it must be 'egregious,'" United States v. Getto, 729 F.3d 221, 228 (2d Cir. 2013), and of the sort that "violates fundamental international norms of decency." United States v. Emmanuel, 565 F.3d 1324, 1331 (11th Cir. 2009).

We are nowhere close to that standard here. To the Court's puzzlement, Defendant harps on the "cooperation between Dominican authorities and the F.B.I." in conducting the search. See Mot. to Suppress at 3–4. But he never explains what is problematic about that cooperation, nor can the Court fathom why it was so. In addition, when "the foreign courts [are] involved and purport[] to authorize the [search]," its execution "does not come close to requiring" exclusion of the obtained evidence. Barona, 56 F.3d at 1091. The Dominican courts' issuance of a warrant in this case thus forecloses Delgado's challenge.

Defendant seems to hang his hat on the fact that Dominican law enforcement deported him to the United States rather than to Venezuela (as apparently required by Dominican immigration law) to facilitate his arrest by the FBI. See Mot. to Suppress at 3–4. Even if such maneuver shocked the judicial conscience, it had nothing to do with the search, which occurred before Delgado's deportation and arrest. See Opp. to Suppression at 9 n.3. Excluding the fruits of search therefore would not remedy any arrest-related violation. With Defendant's first Motion rejected, the Court now moves to his Motion to Sever.

B. Motion to Sever Counts

Delgado's Motion to Sever, like his Motion to Suppress, offers two independent arguments. This time, he maintains that the Indictment's counts were both improperly joined under Federal Rule of Criminal Procedure 8(a), and, separately, that they ought to be severed under Rule 14(a). The Court addresses the Rules one at a time.

    1. *Rule 8 Joinder*

Defendant contends that, as a preliminary matter, the counts against him never should have been joined. Rule 8(a) governs the joinder of multiple counts against the same defendant, providing that counts are properly joined when the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." This Rule "has generally been construed liberally in favor of joinder." United States v. Richardson, 161 F.3d 728, 733 (D.C. Cir. 1998). Indeed, offenses may be "entirely unrelated to each other" and still qualify as of the same character. United States v. Gooch, 665 F.3d 1318, 1325 (D.C. Cir. 2012).

Delgado argues without elaboration that the four counts were improperly combined because "they involve different victims, occurred on different dates, and involve different," but unspecified, "factual allegations." Mot. to Sever at 2. Minor differences do not undermine the conclusion that the three nearly mirror-image hostage takings and the related conspiracy, all charged under the same statute and occurring within the same month, are "of the same or similar character" within the meaning of Rule 8(a). The crimes at issue here undeniably satisfy 8(a)'s modest standard for similarity. See Drew v. United States, 331 F.2d 85, 87, 92 (D.C. Cir. 1964) (robbery involving use of gun and attempted robbery without display of weapon were permissibly joined under Rule 8(a) because "similar in nature"); United States v. Mack, 53 F.

9

Supp. 3d 179, 190 (D.D.C. 2014) (two counts of unlawful distribution of same drug were "of similar character").

In addition, "[w]here an indictment alleges that the defendant and others participated in a conspiracy with the shared goal of enriching themselves, and pre-trial submissions allege a common scheme, joinder is proper." Gooch, 665 F.3d at 1335 (cleaned up). The Indictment includes a conspiracy count and explains that the scheme was aimed at procuring ransom money. See Superseding Indictment at 2. Joinder of these offenses is accordingly proper under the "common scheme or plan" provision in Rule 8(a) as well.

   2. *Rule 14 Severance*

Joinder is not the end of the story, however. A defendant may seek severance of correctly joined counts by invoking Rule 14, as Delgado does here. Where joinder "appears to prejudice a defendant[,] . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. Proc. 14(a). It is the defendant's burden to show the existence of prejudice. United States v. Brown, 16 F.3d 423, 427 (D.C. Cir. 1994).

This Circuit has recognized several kinds of prejudice relevant to a Rule 14 severance analysis: "1) [T]he jury may cumulate evidence of separate crimes; 2) the jury may improperly infer a criminal disposition and treat the inference as evidence of guilt; or 3) the defendant may become 'embarrassed or confounded' in presenting different defenses to the different charges." Gooch, 665 F.3d at 1336 (citation omitted). In addition, prejudice may arise from joinder "when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence." Cross v. United States, 335 F.2d 987, 989 (D.C. Cir.

1964). That is so because by testifying on one count, a defendant "runs the risk that any adverse effects" of that testimony "will influence the jury's consideration of the other count." Id.

A finding of prejudice nonetheless does not necessitate severance in every case. See Fed. R. Crim. Proc. 14(a) ("the court may order" relief upon discovering prejudice) (emphasis added). Rather, "it is incumbent upon the judge to weigh the considerations of economy and expedition in judicial administration against" any prejudice, such as "the defendant's interest in having a free choice with respect to testifying." Bradley v. United States, 433 F.2d 1113, 1122 (D.C. Cir. 1969) (cleaned up). Indeed, "district courts should grant severance sparingly because of the strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors." United States v. Celis, 608 F.3d 818, 844 (D.C. Cir. 2010) (cleaned up).

Delgado submits that a joined trial will prejudice him in every way recognized as problematic under Rule 14. The Court will march through these arguments in sequence.

          a.   Propensity and Cumulation

First up is Defendant's concern that "a jury may use evidence of one crime to infer that he had a propensity to commit the other offenses and," relatedly, that "the jury may cumulate the evidence of all of the crimes charged." Mot. to Sever at 4. These forms of prejudice are negated when "evidence of each of the joined offense would be admissible in a separate trial for the other." United States v. Blunt, 404 F.2d 1283, 1288 (D.C. Cir. 1968) (citation omitted).

The cross-admissibility of evidence concerning each count is, in turn, determined by looking to Federal Rule of Evidence 404(b). That Rule provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

Such evidence, however, is admissible for other purposes, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. 404(b)(2); see also United States v. Appiah, 2020 WL 3469688, at *6 (D.D.C. June 25, 2020) ("[A]ny purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character.") (quoting United States v. Miller, 895 F.2d 1431, 1436 (D.C. Cir. 1990)).

The Government correctly contends that evidence of each hostage taking would be cross-admissible for purposes of proving Delgado's "identity." See Opp. to Severance at 11–14. "[I]f the facts surrounding the two or more crimes on trial show that there is a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed, the evidence of one would be admissible in the trial of the other to prove identity." Drew, 331 F.2d at 90. The hostage takings here share more than enough idiosyncratic similarities to clear that bar. In all three, Delgado allegedly used the same dating-application profile, under the same username, to strike up a relationship with his victims. See Opp. to Severance at 13. He picked all three up in a car to get them alone, then stopped to let in an accomplice, who helped him hold the victims at knifepoint. Id. He demanded ransom from all three and asked for it to be paid to the same CashApp account. Id.

These are not the kinds of happenstance similarities that "fit into an obvious tactical pattern which would suggest itself to almost anyone disposed to commit a depredation of this sort." Drew, 331 F.2d at 93. Rather, these details point clearly toward a common perpetrator and are thus cross-admissible under Rule 404(b). See, e.g., United States v. Levi, 45 F.3d 453, 455 (D.C. Cir. 1995) (finding cross-admissible evidence of robberies that "used similar notes, made

12

similar statements and gestures, wore similar clothing, and robbed banks (some more than once) in the same general area of the city"); United States v. Lawson, 410 F.3d 735, 741 (D.C. Cir. 2005) (same as to robberies "executed by a taller man wielding a distinctive silver-hammered handgun and a shorter man who collected money from the tellers, and the taller individual appeared to wear the same clothes during both crimes"); United States v. Pindell, 336 F.3d 1049, 1058 (D.C. Cir. 2003) (similar); see also United States v. Burwell, 642 F.3d 1062, 1066–67 (D.C. Cir. 2011) (describing *modus operandi* evidence as typically admitted "pursuant to the identity exception" to Rule 404(b)).

Defendant offers nothing to rebut this conclusion, likely because no persuasive response comes easily to mind. The few differences between the crimes — *e.g.*, the use of different cars and different pick-up spots — are not enough to detract from their essential commonalities. See Bradley, 433 F.2d at 1120 (no requirement for purposes of this rule "that the two episodes possess factual sameness in every detail").

Evidence of each hostage taking would likewise be admissible in a trial of the conspiracy count. It is a threshold question whether other-crimes evidence is "intrinsic" — meaning that no Rule 404(b) analysis is triggered — or "extrinsic" to the charged crime. United States v. McGill, 815 F.3d 846, 879 (D.C. Cir. 2016). Our Circuit has concluded that intrinsic evidence "is limited to acts that are 'part of the charged offense' itself or that are 'performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'" Id. at 883 (quoting United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000)). Where, as here, "the indictment contains a conspiracy charge, uncharged acts may be admissible as direct [*i.e.*, intrinsic] evidence of the conspiracy itself." Id. at 881 (cleaned up). Because the hostage

13

takings constitute overt acts necessary to show the existence of a conspiracy, each would be admissible in a separate conspiracy trial, and no Rule 404(b) analysis would even be required.

Finally, evidence, including that which withstands scrutiny under Rule 404(b), may nevertheless be barred by Rule 403 if the risk of "unfair prejudice" associated with it — including the forbidden propensity inference — "substantially outweigh[s]" its probative value. See McGill, 815 F.3d at 880; United States v. Straker, 800 F.3d 570, 589 (D.C. Cir. 2015). Delgado does not advance any arguments under Rule 403, and the Court sees no basis for concluding that the evidence of each crime threatens unfair prejudice in relation to its value in corroborating the perpetrator's identity. That is especially so because the defense has indicated in pretrial proceedings that identity will likely be an issue at trial, making corroboration of Delgado's involvement highly probative. In addition, "[t]he danger of unfair prejudice [is] minimal" where the other crimes are so similar that they add "no emotional or other pejorative emphasis not already introduced by the evidence of the crime charged." Straker, 800 F.3d at 591 (cleaned up); see United States v. Bell, 795 F.3d 88, 99–100 (D.C. Cir. 2015) (evidence of murder committed by defendant admissible because "that shooting 'did not involve conduct any more sensational or disturbing than the [other]' conduct attributed to [him]"); United States v. Bikundi, 2015 WL 5915481, at *6 (D.D.C. Oct. 7, 2015); but see United States v. Jackson, 2021 WL 5711941, at *2 (D.D.C. Dec. 2, 2021) (noting that "danger of unfair prejudice is enhanced" whenever impeachment evidence is crime "similar to the crime now charged") (quoting 28 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 6134 (2d ed.)). In sum, because evidence of each crime would be admissible in separate trials under Rules 404(b) and 403 — or in a conspiracy trial — there is no unfair propensity or cumulation prejudice worked by joinder here.

14

b. Irreconcilable Defenses

Defendant next asserts that "he will be unable to adequately present a defense to one of the hostage-taking incidents because it is irreconcilable with a defense to one of the other counts." Mot. to Sever at 4. This kind of argument is invoked almost exclusively in motions to sever the trials of <u>defendants</u> rather than motions to sever <u>counts</u>. See, e.g., <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993). Delgado, indeed, offers no support for his theory that prejudice can arise from a single defendant's desire to present irreconcilable defenses. After all, in assessing this kind of prejudice, courts distinguish between mutually antagonistic defenses that are merely "tangential to one another" and those "on a collision course"; severance is only required in the latter scenario. <u>United States v. Bolden</u>, 514 F.2d 1301, 1310 (D.C. Cir. 1975). While defenses raised by co-defendants may stand in direct opposition to one another, <u>see, e.g.</u>, <u>United States v. Brodie</u>, 326 F. Supp. 2d 83, 94 (D.D.C. 2004) (contemplating a defendant "seek[ing] to prove the guilt of a co-defendant in order to prove his own innocence"), the Court has difficulty imagining two defenses by Delgado that are so in conflict. For instance, an alibi defense to one hostage-taking count here could coexist with a duress defense to another. Though it may strain credulity to raise both defenses, that is a conundrum in the vein of strategic assessment, not undue prejudice.

Even assuming this kind of prejudice is cognizable in a motion to sever counts, Defendant's threadbare statement that he wishes to raise irreconcilable defenses, on which he does not elaborate, is still not enough to warrant severance. See <u>United States v. Franklin</u>, 2005 WL 8157514, at *14 (D.D.C. Dec. 16, 2005) (deeming similar arguments "too vague to establish that there exists 'a serious risk that a joint trial would compromise a specific trial right'") (quoting <u>Zafiro</u>, 506 U.S. at 539). What is more, it is well settled that even genuinely

15

irreconcilable defenses propounded by co-defendants are not "prejudicial *per se*." Zafiro, 506 U.S. at 538. And when prejudice is shown, Rule 14 "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Id. at 539. For instance, prejudice caused by irreconcilable defenses "is of the type that can be cured with proper instructions," which "juries are presumed to follow," giving courts a much less disruptive alternative to severance. Id. (cleaned up). In sum, Defendant has not met his burden of showing that any prejudice exists, let alone prejudice severe enough to justify severance.

Defendant may nonetheless raise this issue again at trial if a risk of prejudice becomes clear. Schaffer v. United States, 362 U.S. 511, 516 (1960) ("[T]he trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear.").

### c. Selective Testimony

Finally, Delgado claims that "he may wish to testify as to one of the counts but assert his right to remain silent as to the other counts" and thus "may be forced into testifying on the count for which he wished to assert his right to remain silent." Mot. to Sever at 4 (citing Cross, 335 F.2d at 989). He offers to make an *ex parte* proffer of his anticipated testimony but does not add any context for his need to remain silent on three of the counts. Id. at 4 n.1.

In attempting to show prejudice stemming from his selective testimony, Delgado cites the statement in Cross that because "a defendant's silence on one count would be damaging in the face of his express denial of the other[,] . . . he may be coerced into testifying on the count upon which he wished to remain silent." 335 F.2d at 989. Later cases have narrowed and clarified that passage from Cross. As the caselaw currently stands, "the accused's election to testify on some but not all of the charges on trial does not automatically require a severance. Such a rule, . . . in fact, would divest the court of all control over the matter of severance and entrust it to the

defendant." Bradley, 433 F.2d at 1122 (cleaned up). Rather, "no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other." United States v. Baker, 401 F.2d 958, 976–77 (D.C. Cir. 1968) (elucidating the "essence of [the] ruling in Cross").

Under the standard announced in Baker, Defendant has not done enough to satisfy his burden of showing prejudice. Even assuming that his testimony on the one count would be significant and helpful, his reasons for remaining silent on the others remain a mystery. Without that information, the Court cannot assess prejudice or balance that prejudice against the interest in judicial economy, which is substantial here because the same physical evidence and much of the testimony would be relevant to all four crimes. See United States v. Michel, 2019 WL 5797669, at *15 (D.D.C. 2019) (where "severance would result in presenting a significant amount of overlapping evidence in a second trial, judicial economy strongly weighs against" it).

Nor does joinder prejudice Delgado in his defense regarding the count on which he wishes to testify. As the Government rightly observes, the "evidence concerning the hostage takings is so inextricably intertwined that cross-examination would necessarily touch on evidence regarding each of the three hostage takings." Opp. to Severance at 16–17. Such cross-examination would be permitted because, as previously discussed, evidence on the other counts would be cross-admissible. As with the irreconcilable-defenses rationale, Defendant may raise this issue again at trial should he be able to articulate the prejudice caused by his selective testimony.

\* \* \*

None of Delgado's arguments for severance persuades.  The counts were properly joined, joinder creates no prejudice related to propensity and cumulation of evidence, and severance is not warranted on the current arguments concerning irreconcilable defenses or selective testimony.  This Motion, like the first, thus comes up short.

### III.     Conclusion

The Court, accordingly, will deny both Motions.  Delgado, however, may raise his Motion to Sever again at trial if justified.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  December 1, 2023