## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Criminal No. 22-CR-304 (JEB)** |
| | : | |
| **DEIVY JOSE RODRIGUEZ DELGADO,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing as to Deivy Jose Rodriguez Delgado (Defendant). Defendant has been found guilty at trial of all counts in the Superseding Indictment, charging him with one count of Conspiracy to Commit Hostage Taking, in violation of 18 U.S.C. § 1203(a) (Count One), and three counts of Hostage Taking, in violation of 18 U.S.C. §§ 1203(a) & 2 (Counts Two through Four). For the reasons set forth below, the government submits that the Guideline-compliant sentence of life in prison is an appropriate sentence in this case. Such a sentence would be "sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors." *Freeman v. United States*, 564 U.S. 522, 529 (2011) (citing 18 U.S.C. § 3553(a)).

### PROCEDURAL HISTORY

Defendant was arrested on September 14, 2022, and has been detained since his arrest. Presentence Investigation Report (PSR, ECF No. 65) at 2. On September 13, 2022, a federal grand jury in the District of Columbia returned a single-count Indictment charging Defendant with Hostage Taking, Attempted Hostage Taking, and Aiding and Abetting and Causing to be

Done, in violation of 18 U.S.C. §§ 1203 and 2, related solely to his involvement in the hostage taking of victim Matthew Carson Taylor. On May 9, 2023, a federal grand jury in the District of Columbia returned a four-count Superseding Indictment charging Defendant with, as to Count One, Conspiracy to Commit Hostage Taking, in violation of 18 U.S.C. § 1203(a), and as to Counts Two through Four, Hostage Taking, Attempted Hostage Taking, and Aiding and Abetting and Causing to be Done, in violation of 18 U.S.C. §§ 1203 and 2, related to his involvement in the hostage takings of victims Matthew Carson Taylor, Luis Jose Oliveras Perez, and Stephen Fulvio Acosta. On December 11, 2023, Defendant was found guilty by a jury of all counts in the Superseding Indictment. His sentencing hearing is scheduled for November 4, 2024.

## FACTUAL SUMMARY[1]

### Overview

The basis for the charges in this case is a series of armed hostage takings that occurred in July 2022 in the Dominican Republic, and which were committed using substantially similar means. In each case, Defendant, using the name "Sebastian," met his victim online through the same dating application, lured the victim to his vehicle with the promise of a date or casual outing, held and robbed the victim of money and property at knifepoint with the assistance of a co-conspirator, and forced the victim to call friends or family members to secure money for the victim's release. Defendant turned what the victim believed would be a fun outing into an all-too-real violent nightmare.

---

[1] The facts below are derived from the PSR (ECF No. 65 at ¶¶ 9-21), as well as government counsel's best recollection of the trial testimony.

Defendant proceeded to a trial by jury and was convicted of all counts. Each of the victims described above testified at trial, as well as friends and family members of each victim who had received demands for money in exchange for a victim's release. In addition, one civilian witness and two law enforcement witnesses traveled from the Dominican Republic to provide testimony at trial. Defendant did not testify in his defense.

### **Victim-1**

On July 5, 2022, Defendant picked up Victim-1 (Stephen Fulvio Acosta) in the Dominican Republic for what Victim-1 thought was going to be a casual outing. Victim-1 was in the Dominican Republic for a vacation with a friend (Daryel Jarman, who testified at trial). Defendant and Victim-1 had met via an online dating application known as Grindr where Defendant identified himself as "Sebastian" and had continued their conversation via text messages. Govt's Trial Ex. V1-1A. Defendant and Victim-1 had conversations over multiple days about meeting in person, and Defendant sent Victim-1 a photograph of himself.

During these conversations, Defendant claimed to want to get to know Victim-1 and spend time with him. For example, on June 30, 2022, Defendant wrote, ""I'd like to invite you to have dinner and share with you, because it's really you who I want to get to know." *Id*. In another message that same day, Defendant wrote, "In short, I prefer to go out with you alone. I've got a car and could pick you up and take you to wherever you're staying." *Id*.

On July 5, 2022, Defendant was driving a silver Hyundai Sonata with the license plate number ending in -451. He arrived at the location where Victim-1 and his friend were staying, and Victim-1 went outside to meet him. After confirming Defendant was the same person as in the photograph sent to Victim-1, Victim-1 entered the car. Victim-1 noticed that Defendant seemed nervous and edgy.

Defendant drove for a short while, then suddenly pulled the car over and stopped. An unknown male subject, who appeared to be waiting by the side of the road, jumped into the backseat of the vehicle and put Victim-1 in a headlock from behind. Defendant pulled out a serrated knife, and the unknown male also brandished a serrated knife and held it up against the back of Victim-1's neck. Defendant then tied Victim-1's hands with zip-ties. Despite Victim-1's fear, he resisted Defendant's demands for Victim-1's financial information and his phone and started singing out of nervousness. This resistance caused Defendant to stab Victim-1 and cut him on the leg and face. Defendant showed Victim-1 a scar on his neck and claimed, "Yo soy bruto." [I'm tough]. Defendant also threatened to cut out Victim-1's tongue and torture him.

Defendant demanded Victim-1's phone and told him to send a voice memo to a friend with whom Victim-1 was staying in the Dominican Republic (Jarman). Victim-1 sent a surreptitious message to his friend: "What's the maximum I'm being held hostage, call the police. How much money can you send me?" Govt's Trial Ex. V1-4. Defendant then told Victim-1 to tell his friend that he had been kidnapped and that he would only be released if money was sent to the kidnappers. Defendant sent the photo below, showing a zip-tied and injured Victim-1, to Victim-1's friend.

***Photo taken by the defendant and sent to Daryel on 7/5/2022 using Stephen's phone, Govt's Trial Ex. V1-20***



Defendant used the photo of Victim-1 to compel Victim-1's friend (Jarman) to send money. Govt's Trial Ex. V1-21. One of the accounts provided by Defendant for money to be sent was identified as a CashApp account with the name Geneitha Nettles. *Id*. After Mr. Jarman sent $200 to an account provided by Defendant and his co-conspirator, Victim-1 was released without his cellphone or money. Victim-1 was dropped off in an unfamiliar part of town and made himself memorize the license plate number from Defendant's car so that he could report the crime to the police. He was later able to draw a sketch of Defendant from memory that bore a striking resemblance to Defendant. *See* Govt's Trial Ex. V1-31. Mr. Jarman feared for his friend's life after receiving threatening messages from Defendant and then losing contact with Victim-1, which became apparent during his testimony at trial.

### Victim-2

On July 22, 2022, Defendant connected with Victim-2 (Luis Jose Oliveras Perez) via Grindr where he introduced himself as "Sebastian." Victim-2 was in the Dominican Republic for work. During their online conversations, Defendant sent a photograph of himself to Victim-2. Defendant and Victim-2 also chatted by video. After communicating over Grindr and WhatsApp about the possibility of meeting in person, Victim-2 agreed, and Defendant picked up Victim-2 in the Dominican Republic for what Victim-2 thought was going to be a date. Defendant arrived to pick up Victim-2 in a gray Hyundai Sonata, and Victim-2 entered the vehicle after confirming that Defendant appeared to be the same individual from the picture that was sent over the dating application and from the video chat. This same photo (Govt's Trial Ex. V2-1) was later found in Defendant's iCloud account (Govt's Trial Ex. ISP-28).



After driving for a short while, Defendant pulled over onto a side street. An unknown male subject then entered the backseat of the vehicle and held a knife to Victim-2's throat after placing him in a headlock from behind. Defendant threatened Victim-2 and ordered him to start calling friends to get money in exchange for his life. Victim-2 called friends and two of his brothers to request money in exchange for his release. Defendant had control of Victim-2's phone and used it to send demand messages to Victim-2's brothers. The messages Defendant sent were horrifying, including: "Your brother has been kidnapped … And we want 5 thousand dollars" (Govt's Trial Ex. V2-4A), "Get 3 thousand for me to release him … He is fine but right now [*staying the*] same depends on you." (*id*.), and "We're waiting for them to finish paying the rest of the money to release him" (Govt's Trial Ex. V2-8A). Equally disturbing, Defendant sent a

photo of Victim-2 to one of his brothers (Luis Angel Oliveras Perez, who testified emotionally at trial); the photo showed a knife at Vitcim-2's neck. *See* Govt's Trial Exs. V2-8A and V2-10.

One of the accounts provided by Defendant for money to be sent was identified as a CashApp account with the name Geneitha Nettles. Govt's Trial Exs. V2-4A and V2-6A. After one of Victim-2's brothers sent $7,000 to an account to secure Victim-2's release, Defendant and his co-conspirator released Victim-2 onto the street and without his cellphone.

Victim-2's brothers testified at trial. They expressed shock and fright from the events that day and explained how they feared for their brother's safety and life if they did not comply with Defendant's demands.

### Victim-3

On July 30, 2022, Defendant picked up Victim-3 (Matthew Carson Taylor) in the Dominican Republic for what Victim-3 thought was going to be a date. Victim-3 was in the Dominican Republic for work. Defendant and Victim-3 had met via Grindr where Defendant had introduced himself as "Sebastian." Defendant and Victim-3 eventually moved their conversation to WhatsApp where Defendant used phone number +18296457889 (the same WhatsApp number used with Victim-1). Govt's Trial Ex. V3-52. Defendant and Victim-3 then had conversations over the course of multiple days about meeting in person to which Victim-3 eventually agreed. Defendant sent photographs of himself (Govt's Trial Exs. V3-1 & V3-2) to Victim-3 before their date. These same photos were found in Defendant's iCloud account. *See* Govt's Trial Exs. ISP-21, ISP-24 & ISP-32.







On the evening of their supposed date, Defendant arrived to pick up Victim-3 in a red Hyundai Elantra with license plate number ending in -554. Victim-3's coworker (Ariana Hewitt, who testified at trial) was waiting with Victim-3 for Defendant to arrive and photographed the Elantra's license plate. Govt's Trial Ex. V3-3. Victim-3 was excited but also taking some basic precautions, as indicated by these messages he sent to a friend before the date: "Use location tracking if you don't hear from me tonight tho [laughing face emoji]," "Boca chica boy taking me out" and "We just going to dinner … But he adamant about picking me up. Chivalrous and shit." Govt's Trial Ex. V3-28. His coworker replied, "Send us his pic … Just in case I need a pic for the police," Govt's Trial Ex. V3-29, a shockingly prescient message. Victim-3 did send Ms. Hewitt a photograph of Defendant (*see* Govt's Trial Ex. V3-30), and Ms. Hewitt sent that photograph and the photograph of the license plate of Defendant's car to the Dominican Republican police. These actions ultimately led to Defendant's arrest.

Back on July 30, 2022, Victim-3 entered the vehicle after confirming that Defendant appeared to be the same individual from the pictures Defendant had sent to him. Defendant drove on the highway and then suddenly pulled to the side of the road at a metro stop. An unknown male subject ran towards the vehicle and entered the backseat. While the unknown male put Victim-3 in a headlock from behind, Defendant brandished a knife and informed Victim-3 that both subjects had knives. Defendant threatened and slapped Victim-3 and then ordered him to contact Ms. Hewitt for money. Her reply underscores the tense situation: "Why do you need cash app … Are you in danger[?]" Govt's Trial Ex. V3-32. Victim-3 lied and assured Ms. Hewitt he was fine. Unfortunately, Ms. Hewitt was unable to send any money.

Defendant next ordered Victim-3 to call his brother (Thomas Zachary Taylor, who testified at trial) and request that his brother send $10,000 to secure Victim-3's release. Victim-3 complied with this order and contacted his brother through voice and text messages. Text messages sent to Victim-3 by his brother illustrate the brother's fear. *See* Govt's Trial Exs. V3-5 and V3-6. In a series of messages, Zach Taylor wrote, "Is there any way we can have another convo before I send the other one/I'm really scared/I need to know what's going on/Or what's at stake here." *Id*. Defendant's cold, one-word reply: "No." Govt's Trial Ex. V3-6.

One of the accounts provided by Defendant for money to be sent was identified as a CashApp account with the name Geneitha Nettles. Govt's Trial Ex. V3-5. After Victim-3's brother appeared to have sent $200 to an account provided by the subjects, Victim-3 was released without his cellphone. Victim-3, having feared for his life and that he might never see his parents again, was freed not far from his hotel and eventually made it back there. GPS records from a vehicle tracker on Defendant's car corroborated Victim-3's testimony. *See* Govt's

Trial Ex. CA-1.  Victim-3 suffered pain and discomfort for days after his arrest due to being placed in headlock during the entirety of his hostage taking ordeal.

### **Identification of Defendant**

Dominican law enforcement officers were able to identity the registered owner (Fernando Lugo, who testified at trial) of the red Hyundai Elantra with license plate number ending in -554. The officers interviewed Mr. Lugo and discovered that the red Hyundai Elantra was leased at the time of the hostage taking of Victim-3 to Defendant. Mr. Lugo provided officers with the lease documents for the red Hyundai Elantra with Defendant's full name and initials. *See* Govt's Trial Ex. W1-3 & W1-3A. This lease lists the same license plate number as in the photo taken by Ms. Hewitt. Mr. Lugo also produced identification documents Defendant had provided to Mr. Lugo. *See* Govt's Trial Exs. W1-6 and W1-7. Mr. Lugo explained that Defendant had previously leased a gray Hyundai Sonata with a license plate number ending in -451 (the same number memorized by Victim-1) during the same timeframe that Victim-1 and Victim-2 were taken hostage. Dominican Republic police took a photo of that car. *See* Govt's Trial Ex. DR-22-1.

Mr. Lugo normally communicated with Defendant over WhatsApp, where Defendant used phone number ending in -7889 (the same WhatsApp number Defendant used to communicate with Victim-1 and Victim-3). *See* Govt's Trial Ex. W1-12. Further investigation revealed that this phone number was also linked to a Twitter account in Defendant's true name. *See* Govt's Trial Exs. ISP-1 & ISP-2. Finally, Mr. Lugo provided a photograph of Defendant that Defendant used in his WhatsApp communications with Mr. Lugo that appears to be the same photograph that Defendant sent to Victim-2 prior to Victim-2's hostage taking. *See* Govt's Trial Ex. W1-5.

### **Defendant's Arrest**

Armed with the information provided by Mr. Lugo—which included tracking information for the red Hyundai Elantra Defendant had rented from Mr. Lugo—the Dominican Republican police surveilled Defendant at a casino and then on his drive from the casino back to his apartment. Photos from this surveillance (Govt's Trial Exs. DR-33-2 & DR-33-8) are included below:

 

Following investigations conducted by both the Federal Bureau of Investigation (FBI) and Dominican Republic law enforcement, Defendant was arrested at his apartment in the Dominican Republic on September 10, 2022. While effectuating Defendant's arrest, Dominican Republic law enforcement located the red Hyundai Elantra used to kidnap Victim-3 and owned by Mr. Lugo parked in the parking lot of Defendant's apartment complex. Dominican officers searched the Elantra pursuant to a search warrant issued by a Dominican Magistrate and found two serrated knives with black handles inside the vehicle. Photos of the knives (Govt's Trial Exs. DR-23-6 and DR-23-7) are included below:



Dominican law enforcement officers also executed a Dominican search warrant at Defendant's residence. During the search, Dominican law enforcement officers located a white and gold Apple iPhone 7 Plus (Govt's Trial Ex. PE-3) on a nightstand in Defendant's bedroom. The display background on the iPhone appeared to be the same photograph of Defendant that Defendant had sent Victim-2 prior to Victim-2's hostage-taking and that Defendant had used in WhatsApp communications with Mr. Lugo (Govt's Trial Exs. DR-23-3 & DR-23-4). Officers also found an insurance card for the car Defendant had rented from Mr. Lugo and used in the hostage-taking of Victim-3 (Govt's Trial Ex. PH-18), as well as cash, electronic devices, and jewelry (Govt's Trial Exs. DR-23-5 & PH-23).

Investigators identified two Apple iCloud accounts registered in Defendant's name and linked to phone number +18296457889. The Apple iCloud accounts were linked to the iPhone 7 Plus that was found in Defendant's bedroom. A search of the data backed up to these two iCloud accounts revealed copies of the photographs that Defendant had sent to Victim-2 and Victim-3 prior to their hostage takings (Govt's Trial Exs. ISP-24, ISP-28, ISP-31 & ISP-32), Mr. Lugo's contact information (Govt's Trial Ex. ISP-27), photographs of Defendant's identification documents provided by Mr. Lugo (Govt's Trial Exs. ISP-25 & ISP-26), and a Grindr account that listed an account name of "Sebastian" (Govt's Trial Exs. ISP-33 & ISP-39).

## Background on Defendant

Defendant was born in Venezuela in 1994. ECF No. 65 at ¶ 76. Before his arrest in this case, he had been living in the Dominican Republic—where the hostage taking occurred—since 2017. *Id*. at ¶ 81. Defendant completed the equivalent of a high school education in Venezuela and earned a bachelor's degree in biology and chemistry in June 2017 from the Universidad Catolica Andres Bello (Catholic University Andres Bello). *Id*. at ¶ 90. Defendant has worked various jobs in the Dominican Republic, including as a private chauffeur from 2018 to his arrest in 2022. *Id*. at ¶¶ 91-93. He worked as a professor in Venezuela. *Id*. at ¶ 94. Despite his education and work experience, Defendant chose to commit the violent crimes at the heart of this case.

## SENTENCING RECOMMENDATION AND ANALYSIS

As discussed below, the Sentencing Guidelines should be the starting point for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). In this case, the applicable Guideline range for Counts One, Two, Three, and Four (as grouped under the Guidelines) is life imprisonment. The government is recommending the Court sentence

Defendant to life in prison.

## Legal Standards

"Federal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors." *Freeman v. United States*, 564 U.S. 522, 529 (2011) (citing 18 U.S.C. § 3553(a)). In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the Guidelines are no longer mandatory. However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007). Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." 552 U.S. at 49. Accordingly, in this case, the Court should first evaluate the recommended sentence considering Defendant's applicable Guideline range.

Next, the Court should consider all the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50. In "the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). The § 3553(a) factors include, *inter alia*: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; (4) the need to avoid unwarranted sentencing

disparities among defendants with similar records who have been found guilty of similar conduct; and (5) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

**Statutory Maximums**

Violations of Conspiracy to Commit Hostage Taking, in violation of 18 U.S.C. § 1203(a), and Hostage Taking, in violation of 18 U.S.C. §§ 1203(a) & 2, carry a maximum statutory sentence of life in prison. ECF No. 65 at ¶ 100. The maximum term of supervised release for each count is five years, and the maximum fine is $250,000. *Id.* at ¶¶ 104 & 119. Multiple terms of supervised release are to run concurrently. *Id.* at ¶ 105.

**Sentencing Guidelines Calculation**

Guideline § 2A4.1 is the applicable Guideline provision for 18 U.S.C. § 1203(a) offenses. That section provides for a base offense level of 32. U.S.S.G. §2A4.1; ECF No. 65 at ¶ 34. As the Probation Officer determined, the applicable Guidelines are as follows:

| | |
|---|---|
| **Base Offense Level** | |
| U.S.S.G. § 2A4.1 | 32 |
| | |
| **Specific Offense Characteristics** | |
| U.S.S.G. § 2A4.1(b)(1) (Ransom Demand) | +6 |
| | |
| U.S.S.G. § 2A4.1(b)(3) (Dangerous Weapon) | +2 |
| U.S.S.G. § 3D1.4 (Multiple Count Adjustment) | +3 |
| | |
| **Total Offense Level** | 43 |

ECF No. 65 at ¶¶ 30-67.

According to the Probation Officer, the applicable Guideline range for Defendant is life in prison, based on a total offense level of 43 and a Criminal History Category of I. ECF No. 65 at ¶ 101. The government agrees with the Probation Officer's calculations.

### *Guidelines for Supervised Release and a Fine*

The government agrees with the Probation Officer that the guideline range for a term of supervised release is two to five years for each count. ECF No. 65 at ¶ 106. The government further agrees with the Probation Officer that the fine Guideline range for Defendant is $50,000 to $250,000. *Id.* at ¶ 121.

### Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)

As discussed below, an analysis of the factors provided in 18 U.S.C. § 3553(a) shows that a sentence of life in prison is an appropriate sentence in this case.

### *The Nature and Circumstances of the Offense*

The nature and the circumstances of the offense are extremely serious, as reflected in the Guideline range. On three separate occasions, Defendant lured his victim online and through the phone with the promise of a casual get together or a nice evening out, and then, along with an accomplice, kidnapped the victim at knifepoint, threatened him, and caused him to fear for his life. While the victim was held hostage, Defendant demanded that the victim contact his friends and family members to obtain ransom payments in exchange for the victim's release, terrifying these individuals as well. While there were other members of the conspiracy, Defendant played a leading, direct role in these hostage takings.

Defendant also showed no signs of stopping his egregious pattern of serial hostage takings following the hostage taking of Victim-3. Indeed, the serrated knives found within the door panel of the Hyundai Elantra that was parked at Defendant's apartment complex upon his arrest demonstrated his ability and willingness to continue his hostage takings for profit at a moment's notice. As evidenced by the testimony of the Dominican Republic law enforcement officers and GPS data related to the Hyundai Elantra, Defendant frequently visited a casino in the Dominican Republic that very likely played a role in his reoccurring need for quick cash.

Not surprisingly, both the FBI and Dominican Republic law enforcement gathered evidence that Defendant was indeed involved in at least one additional uncharged hostage taking of a dual U.S. and Dominican Republican national, which the government seeks the Court to consider at sentencing. Long-standing U.S. Supreme Court and D.C. Circuit precedents establish that "a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence." *United States v. Norman*, 926 F.3d 804, 811 (D.C. Cir. 2019) (quoting *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008)). To properly consider uncharged or acquitted conduct in calculating an appropriate sentence, the conduct must be proved by only a preponderance of the evidence. *Settles*, 530 F.3d at 923. Here, the FBI has gathered sufficient evidence throughout the investigation to establish that Defendant was involved in the uncharged hostage taking of a fourth victim (AA) in the Dominican Republic on or about August 27, 2022.

AA reported to the FBI that, on August 27, 2022, he was visiting the Dominican Republic with a friend but had decided to stay at the resort that day as he was not feeling well. *See* Gov. Sent. Ex. 1. AA eventually called an Uber to take him to a pharmacy to get some medicine. *Id.* Once the Uber pulled up to the gates of AA's resort, the Uber driver called him from the phone number +18296457889, which was the same phone number used by Defendant to communicate with Victim-1 and Victim-3, and the same phone number linked to Defendant's Apple iCloud accounts and recovered cellphone. *See* Gov. Sent. Ex. 2. AA described the vehicle that the Uber driver was driving as a red Hyundai Elantra with the license plate number ending in -554, which fits the description of the vehicle used in the hostage taking of Victim-3 that belonged to Mr. Lugo and was found parked at Defendant's residence approximately two weeks later. *See* Gov. Sent. Ex. 3; *see also* Gov. Sent. Ex. 1. AA entered the Uber and after about five minutes of driving, another unknown individual entered the vehicle and ordered AA to climb into the front

seat as the unknown individual did not want AA to exit the vehicle. *See* Gov. Sent. Ex. 1. The unknown individual in the back seat held a knife to the back of AA's neck while the Uber driver took AA's phone and asked for the password. *Id.* The Uber driver looked through AA's phone, asked about various contacts, and looked for money applications. *Id.* The Uber driver then took a photograph of AA and texted it to numerous people from AA's phone with a message saying that AA needed money and to please send money. *Id.* A redacted copy of the photograph is shown below:



The Uber driver struck AA in the face, held a knife to AA's thigh, and took AA's cash and cellphone. *Id.* The Uber driver also had AA send voice notes to his contacts and explain that he was in a situation and needed money. *Id.* AA described the Uber driver as around 30 years of age, average build, light complexion, dark hair with a receding hairline, and scars on his arms that looked like burns. *Id.* Ultimately, no one ended up sending money, and the Uber driver released AA after approximately an hour in front of a restaurant. *Id.*

AA was shown a series of photographs with no identifiers to include a photograph of Defendant. *Id; see also* Gov. Sent. Ex. 1A. AA indicated that he did not recognize anyone in the photographs, however. *Id.* Charges thus were not brought against Defendant related to this hostage taking. At the same time, AA's hostage taking was striking similarity to the hostage takings of Victim-1, Victim-2, and Victim-3. The similarities between the hostage takings along with the use of the red Hyundai Elantra with the license plate number ending in -554 and Defendant's identified phone number demonstrate by a preponderance of evidence that Defendant participated in AA's hostage taking. The Court thus should take AA's hostage taking into consideration, along with the evidence indicating that Defendant showed no signs of stopping his behavior, in fashioning Defendant's ultimate sentence.

### *The History and Characteristics of the Defendant*

Defendant was born in Venezuela in 1994. He graduated from college in Venezuela and was employed during the relevant time. He has no known criminal history and zero criminal history points. Defendant's education and employment indicate that Defendant had other options for earning money besides grabbing and holding victims at knifepoint for ransom. Evidence adduced at trial showed that Defendant engaged in gambling and had a taste for gold jewelry and other luxury items. In addition, Defendant has displayed absolutely no remorse for his actions and has failed to take any responsibility for his actions. Instead, he forced the government to expend significant resources in proceeding to trial despite overwhelming evidence of his guilt.

***The Need to Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and to Protect the Public***

Deterrence and promoting respect for the law should be the principal goals of the Court's sentence in this case. To promote respect for the law—both by the defendant and the public—it is necessary and appropriate to impose a meaningful sentence. Defendant's disregard for the law, and his willingness to commit violent hostage-takings for money, illustrate why the recommended sentence is justified to protect this country from new illegal schemes that Defendant, or others, might formulate. A sentence that is too lenient would convey the wrong message and could convince others that kidnapping U.S. citizens for ransom is worth the risk of getting caught by U.S. law enforcement and facing a relatively minor penalty. Additionally, that Defendant committed multiple hostage takings over the course of weeks demonstrates the threat to the public that Defendant presents.

***The Need to Avoid Unwarranted Sentencing Disparities***

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The government has identified several cases of somewhat similarly situated defendants and includes information on those sentences to the extent they are useful to the Court. Viewed in light of these past sentences, a sentence of life in prison would avoid unwarranted sentencing disparities.

- In *United States v. Joly Germine*, Judge Bates sentenced the defendant to 420 months (35 years) in prison for his role as a leader of a conspiracy to smuggle semi-automatic weapons from the United States to Haiti for use by a violent gang and to launder ransoms paid by U.S. persons taken hostage by the gang. Case No. 21-CR-699-1 (JDB) (sentence imposed in June 2024).

21

- In *Martinez v. United States*, the district judge sentenced the defendant to life imprisonment after a conviction at trial for violations of conspiracy to commit hostage taking, hostage taking, conspiracy to commit carjacking, carjacking, and using and carrying a firearm during crimes of violence. Martinez and an accomplice had kidnapped a woman and her two children; during the hostage-taking, which lasted five days, Martinez and his accomplice shocked the woman with a stun gun and struck her repeatedly in her face, shot one of her children in his head and neck with the stun gun, and threatened to kill the woman. The sentence was affirmed on appeal. 853 Fed. Appx. 416, 416-417 (Mem) (11th Cir. 2021).

- In *United States v. Palmera Pineda*, Judge Lamberth sentenced the defendant, a senior member of the Colombian FARC, to sixty years in prison based on evidence that he had conspired with other members of the FARC to detain several American citizens to be used as bargaining chips in negotiations with the government of Colombia. Case No. 04-cr-00232, *aff'd* 592 F.3d 199, 199 (D.C. Cir. 2010).

- In *United States v. Tchibassa*, the defendant, a high-ranking member of the Angolan "Front for the Liberation of the Enclave of Cabinda" was sentenced to 293 months for the hostage taking of a *single* U.S. citizen, where the primary motivation was money and there was no political motive. 452 F.3d 918, 921 (D.C. Cir. 2006) (noting that the hostage takers demanded money from the victim's employer, Chevron).

- In *United States v. Yunis*, the D.C. Circuit affirmed the sentence of five years for conspiracy, thirty years for hostage taking, and twenty years for air piracy for the defendant's participation in a Jordanian airplane hijacking to get Palestinians to leave Lebanon, where all the victims were released. 924 F.2d 1086, 1090 (D.C. Cir. 1991).

Defendant's actions in this case—luring, kidnaping, and then holding three U.S. victims hostage at knifepoint for money—are most similar to those of *Tchibassa*, where the defendant was convicted of only one hostage-taking. Unlike in *Germine*, Defendant was personally involved in each of the hostage-takings for which he was convicted. Unlike in *Palmera Pineda* and *Yunis*, there was no apparent political motive.

The PSR notes that, during the last five fiscal years, the 16 defendants with the same primary guideline (§ 2A4.1), final offense level (43), and criminal history category (I) as Defendant who received a prison sentence received an average sentence of 350 months' imprisonment, with a median of 403 months' imprisonment, after excluding defendants who received a §5K1.1 substantial assistance departure. ECF No. 65 at ¶ 127. Without any specifics about those cases, it is impossible to determine how comparable they are to the facts of this case. At the same time, they provide support for the recommended sentence.

The requested sentence is well within the range of previous sentences imposed in similar cases, which satisfies 18 U.S.C. § 3553(a)(6).

## Restitution

The provisions of the Mandatory Victim Restitution Act of 1996 apply to the offenses in this case. ECF No. 65 at ¶ 22. The government provided records and information supporting restitution orders in this case to the Probation Officer (after the final PSR had been issued). In particular, the government provided bank records and interview reports from the victims, as well as a chart detailing the losses sustained by each victim and whether such losses had been reimbursed. Those same documents are attached as Govt's Sent. Exs. 4-16. According to the government's evidence, the following victims suffered unreimbursed losses in the amounts listed below:

Stephen Acosta                    $1,009 (approximate)
Daryel Jarman                     $200
Luis Jose Oliveras Perez          $1,950 (approximate)
Luis Angel Oliveras Perez         $3,000

Victims Matthew and Zachary Taylor also suffered losses, but the government has been unable to determine if they were reimbursed for their losses.

## **CONCLUSION**

WHEREFORE, the government respectfully recommends that the Court sentence Defendant Deivy Jose Rodriguez Delgado to a sentence of life in prison, a term of supervised release between two and five years, and restitution in the amounts of $1,009 (Stephen Acosta), $200 (Daryel Jarman), $1,950 (Luis Jose Oliveras Perez), and $3,000 (Luis Angel Oliveras Perez).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar 481052

By:    */s/Jolie F. Zimmerman*
       JOLIE F. ZIMMERMAN
       D.C. Bar No. 465110
       JOHN F. KORBA
       D.C. Bar No. 1010303
       Assistant United States Attorneys
       United States Attorney's Office for the District of Columbia
       601 D Street, N.W.
       Washington, DC 20530
       (202) 252-7220 (Zimmerman)
       (202) 252-7246 (Korba)
       Jolie.Zimmerman@usdoj.gov
       John.Korba@usdoj.gov