**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES OF AMERICA** |
| **v.** |
| **DEIVY JOSE RODRIGUEZ DELGADO,** |
| **Defendant.** |

**Crim. Action No. 22-CR-304(JEB)**

## MEMORANDUM IN AID OF SENTENCING



*"Under love's heavy burden do I sink."*

-Act 1, Scene 4, Romeo and Juliet
William Shakespeare

Deivy Rodriguez Delgado will be before the Court for sentencing on November 4, 2024, after having been convicted by a jury of, *inter alia*, hostage taking, in violation 18 U.S.C. § 1203.

The Court is well-versed with the facts of this case having presided over the week-long trial. Mr. Delgado does not dispute that the offense conduct was serious and that the victims were indelibly impacted by the experience. However, the Guidelines range as applied to the conduct here—where no one was seriously physically injured or killed—is grossly excessive. Moreover, as explained below, Mr. Delgado's Guidelines range is not a product of the Sentencing Commission's reasoned, empirically-based approach. Instead, the range is a result of direct Congressional intervention—the purpose of which was to impose draconian sentences for crimes *against children*— which had the effect of dramatically increasing the base offense level for defendants like Mr. Delgado whose victims were not children. As such, the purpose of the dramatic increase to the Guidelines range has no applicability to Mr. Delgado's case.

Setting aside the Guidelines range, from a proportionality perspective, this is not a case for which a young man should live out the rest of his life in prison. Instead, a sentence of 120 months would reflect the seriousness of the offense, Mr. Delgado's unique struggles, his potential for good, and sentences imposed in other cases involving comparable conduct, as well as account for his ultimate deportation and the considerations detailed in *United States v. Smith*. Moreover, it is the only sentence that is sufficient but not greater than necessary in light of the sentencing factors set out at 18 USC §3553(a).

## Sentencing Law

### I.    This Court has broad discretion to impose a sentence less stringent than the one suggested by the Guidelines.

Nearly twenty years after the Supreme Court's *United States v. Booker*, it is now "emphatically clear" that the "[g]uidelines are guidelines – that is, they are truly advisory."

*United States v. Cavera*, 550 F.3d 120, 189 (2d Cir. 2008). *See also Kimbrough v. United States*, 552 U.S. 85 (2007) (Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. § 3553(a)); *Gall v. United States*, 552 U.S. 38 (2007) (same).   Courts must consider the Guideline range as just one of more than a half dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a).

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id*. § 3553(a) (emphasis added).

Importantly, the Supreme Court has reiterated that in imposing sentence, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 477

(2011); *Gall v. United States*, 552 U.S. 38 (2007) (upholding a probationary sentence in a drug conspiracy case, down from a guideline range of 30-37 months, due to the extraordinary aspects of the prosecution and the defendant, and stating that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing").

Sentencing courts are encouraged to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020) ("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

## Argument

### I.    Objection to the Pre-Sentence Report

#### i.    A two-level enhancement under USSG § 2A4.1(b)(2)(B) does not apply because the record does not support a finding that the victims sustained serious bodily injury.

"Serious bodily injury" is defined in the Guidelines as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or

requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S. Sent'g Comm'n, Guidelines Manual §1B1.1, comment. (n.1(M)) (Nov. 2023).

The record in this case does not support that any victim experienced serious bodily injury. Starting with the first victim who testified, Mr. Acosta, even though his thigh and cheek sustained a minor cut, he did not seek medical attention. When asked if it hurt, he responded, "I didn't feel it honestly." Trial Tr. 12.4.2023, 204. When the second victim, Mr. Olivares-Perez, was asked, "were you injured at all during the hostage taking?" he responded "no, sir." Trial Tr. 12.5.2023, 173. The third victim, Mr. Taylor, testified that he had "bruising" and was "sore for a while after that experience." Trial Tr. 12.6.2023, 29.

None of the victims sought or required medical attention after the incident. None of the victims testified that they experienced anything tantamount to "extreme physical pain or protracted impairment of a bodily, member, organ, or mental faculty." *See* USSG §1B1.1, comment. (n.1(M)). While what occurred was serious, a two-level enhancement for "serious bodily injury" does not apply to Mr. Delgado's case. *Cf. United States v. Martinez*, 385 F. App'x 594, 596 (7th Cir. 2010) (finding serious bodily injury enhancement properly applied where the victim had been "choked, beaten with a gun, and burned with a torch," leaving him with "extremely painful injuries to his head and face that required hospitalization and stitches and left him too dizzy to walk.").

## II.    The 2A4.1 offense level is not based on empirical data, deserves little deference, and results in a grossly excessive sentencing range for Mr. Delgado.

Even if the Court grants the defense' objection to a 2-level enhancement for serious bodily injury, the Guidelines are calculated at life—a grossly excessive and unjust punishment in light of the fact that no one was killed or permanently physically injured. The Guidelines range of life in prison fails to come close to recommending an appropriate sentence.

Mr. Delgado's Guidelines range is not a product of the Sentencing Commission's reasoned,

empirically based approach. Instead, the Guidelines range is a result of direct Congressional intervention—the purpose of which was to impose draconian sentences for crimes *against children*. As such, the purpose of those increases, even if valid in some cases, has no applicability to Mr. Delgado's case. For these reasons, Mr. Delgado's Guidelines range is deserving of little deference from the Court.

### i.    The Sentencing Guidelines are based on empirical approach.

Congress established the United States Sentencing Commission ("the Commission") "to formulate and constantly refine national sentencing standards." *Kimbrough v. United States*, 552 U.S. 85, 108 (2007); *see also*, *Rita v. United States*, 551 U.S. 338, 349 (2007). In the Commission's initial development of a sentencing system, it took "an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice." USSG Ch.1 Pt.A.1. The Commission "analyzed data drawn from 10,000 presentence investigations, the differing elements of various crimes as distinguished in substantive criminal statues, the United States Parole Commission's guidelines and statistics, and data from other relevant sources in order to determine which distinctions were important in pre-guidelines practice." *Id*. This empirical approach has helped the Commission resolve "practical problems by defining a list of relevant distinctions" and those "relevant distinctions not reflected in the guidelines probably will occur rarely and sentencing courts may take such unusual cases into account by departing from the guidelines." *Id*. The Guidelines' strength, however, depends on whether the Commission acted in the "exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 89.

This role has two basic components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice; and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita*, 551 U.S. at 349-50. In that institutional

role, the Commission "has the capacity courts lack 'to base its determination on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough*, 552 U.S. 85, 109 (citation omitted); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (stating that "even though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").

However, "not all of the Guidelines are tied to empirical evidence." *Gall*, 552 U.S. at 46, n.2. When the Guidelines are not based upon an empirical approach and instead are guided by statutory directives, the sentencing court is not presented with the "ordinary case," in which "the Commission's recommendation of a sentence range will "reflect a rough approximation of sentences that might achieve §3553(a)'s objectives.'" *See*, *e.g.*, *Kimbrough*, 552 U.S. at 89 (quoting *Rita*, 551 U.S. at 350). The Commission has noted that its belief "that despite the courts' legal freedom to depart from the Guidelines, they will not do so very often" is based upon the Commission's reliance on factors of "empirical[] import[ance] in relation to [a] particular offense" when developing a guideline.  USSG Ch.1, Pt. A ¶ 1.4(b).

### ii.    The kidnapping guideline is not based on empirical data.

In this case, the Guidelines range is not the product of the Commission's institutional role. Instead, the current base offense level for kidnapping offenses was promulgated, for the most part, in response to statutory directives.  In particular, and as explained more fully below, without the input of the Commission, the section 2A4.1 "Kidnapping" Guideline was amended to increase the base offense level from **24 to 32** without providing for necessary distinctions or a supported empirical basis.

From 1987 until 2003, the base offense level for kidnapping under § 2A4.1 of the

Guidelines was 24. However, in 2003, Congress increased the offense level to 32 as part of the PROTECT Act, a law designed to protect children against exploitation.[1] By doing so, Congress bypassed the Commission and imposed a dramatic increase in the offense level which was based upon policy considerations and not upon the Commission's empirically based approach.

Considering that the PROTECT Act also increased offense levels for other offenses, experts have noted that this Congressional intervention constituted the first time that Congress directly amended the Guidelines by drafting the text of the Guidelines.[2] Whereas, "[i]n the past, Congress often . . . issue[d] directions to and requests for study from the Commission, but left it to the Commission to craft specific Guideline text. This time, Congress *completely ignored the expert role the Sentencing Commission* was designed to play, cut the Commission out of the process entirely, and directly wrote Guideline text to its own specifications."[3] Not only were these Guideline amendments not based on empirical data, but "Congress acted . . . without giving either the Judicial Conference or the Sentencing Commission "a fair opportunity to consider and comment" on the direct amendment."[4]

---

[1] *See* Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. No. 108-21, § 104, 117 Stat. 650 (2003) (directing the USSC to "amend the Sentencing Guidelines . . . so that the base offense level for kidnapping in section 2A4.1(a) is increased from level 24 to level 32").

[2] *See* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* 22 (2009) (hereafter "Deconstructing the Myth").

[3] Steven L. Chanenson, *Hoist with their Own Petard?*, 17.1 Fed. Sent'g Rep. 20, 23 & nn. 54 - 7 (Oct. 2004) (emphasis added).

[4] Stabenow, *supra*, at 22 (citing Chanenson, *supra*, at n.56); *see also* U.S. Sentencing Comm'n, The History of Child Pornography Guidelines 39 n.190 (2009) (the amendments were "enacted by Congress and effective on April 20, 2003, making "it impracticable to publish the conforming amendments in the *Federal Register* to provide an opportunity for public comment before the congressional amendments became effective'").

### iii.   Additionally, the rationale for the increase to the base offense level of kidnapping does not apply to Mr. Delgado's case.

As explained below, aside from the fact that the increase in the kidnapping Guideline is not empirically-based, the rationale for that increase – protecting children – has no applicability to Mr. Delgado's case. As such, little deference should be accorded to the Guidelines' recommendation. *See Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (directing district courts to fashion a sentence that "ensures that the punishment will suit not merely the offense but the individual defendant") (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

The PROTECT Act began in the Senate as the "AMBER (America's Missing Broadcast Emergency Response) Alert" bill which "sought to strengthen federal and state procedures and penalties for investigating and prosecuting kidnapping and sexual exploitation of children.[5] The bill included steps to facilitate coordination and communication between government agencies, law enforcement, and the public to help quickly and successfully resolve child abduction scenarios. It was finite in its scope and enjoyed bipartisan support. *Id.*

However, once this bill reached the House of Representatives, an Amendment introduced by Representative Tom Feeney (the "Feeney Amendment") significantly broadened its scope. The Amendment proposed sweeping changes to the sentencing process including making it more difficult for courts to grant downward departures. The amended bill was adopted by the House after fifteen minutes of debate, and almost immediately received criticism "from virtually every segment of the criminal justice community."[6] The main areas of criticism were the questionable

---

[5] *See* Alan Vinegrad, *The New Federal Sentencing Law*, 15 Fed. Sent'g Rep. 310, 310 (Jun. 2003) (explaining the legislative history of the PROTECT Act).
[6] *Id.* at 313.

needs for such comprehensive reforms and the fact that the reforms were put forward without consultation or consideration from the courts or Sentencing Commission. *Id.*

The reconciliation of the two versions of the bill cut back on the more sweeping provisions of the Feeney Amendment.  However, the enacted law did make several broad changes to the sentencing process, in addition to a number of specific changes to procedures and sentencing in various crimes against children. These changes included raising maximum penalties for child abuse charges, strengthening laws against sex tourism, increasing penalties against sex offense recidivists, eliminating the statute of limitations for child abuse and child sex crimes, and barring pretrial release for those accused of raping or kidnapping children.[7]

As a part of the above-mentioned specific changes, an 8-level increase in the base offense level for kidnapping under USSG § 2A4.1 was also inserted.  *Id.* at § 104. This insertion seems to be anomalous in that it is the only provision that did not in some way necessarily relate to sex crimes or crimes *against children*.  Congress seemed to have overlooked the fact that kidnapping does not always involve a child.

In other words, such blanket increase of offense level for kidnapping in USSG § 2A4.1, without regard for the age of the victim, exceeded the stated intent of the PROTECT Act. Every indication by legislators was that this Act was designed to protect *children*.  For example, the Act describes itself as "an Act to prevent child abduction and the sexual exploitation of children, and for other purposes." PROTECT ACT § 1. Congressman Feeney himself declared that the law was meant to "deter and punish people and put them behind bars for a long time, who are actually about

---

[7] *See* PROTECT Act §§ 101-08 (listing the various changes to be made to the U.S.C. pursuant to the PROTECT Act).

to kidnap, abuse, or sexually offend against *minors*."[8] Senator Orrin Hatch sold the bill as "a truly comprehensive package . . . that will protect our *children* from vicious criminals, pornographers, sexual abusers, and kidnappers."[9]

Mr. Delgado's three victims, of course, are not children, yet his Guidelines range is drastically affected by the provisions of the PROTECT Act designed to protect children. Thus, the increase in his Guidelines range represents an unintended consequence of an overbroad, shortsighted drafting of a piece of legislation whose purpose has no applicability to defendants like Mr. Delgado. This is precisely why Congress should not draft Guidelines' text but should defer to the Commission's experience and expertise. Because that was not done in this case, and because the purpose of the offense level increases imposed by the PROTECT Act does not even fit the facts of Mr. Delgado's case, this Court should accord little weight to the Guidelines' advisory range, as calculated in the Pre-Sentence Report.

   iv.   **The dramatic increase to the kidnapping base offense level results in dramatic and unwarranted increases to the Guidelines range.**

The changes imposed by the PROTECT Act resulted in a dramatic increase in the Guidelines range for kidnapping offenses. Calculating Mr. Delgado's range under the 2002 Guidelines *using the PSR's enhancements* provides a stark illustration of the dramatic escalation in the punishment for kidnapping offenses when compared with the current Guidelines based on the Congressional directive designed to more harshly punish offenses against children. The huge difference is due both to escalating points for the base offense level and the application of other

---

[8] 149 Cong. Rec. H3059-02 (daily ed. Apr. 10, 2003) (statement of Rep. Tom Feeney) (emphasis added).

[9] 149 Cong. Rec. S5113-01 (daily ed. Apr. 10, 2003) (statement of Sen. Orrin Hatch) (emphasis added).

changes to how such offenses are scored.

### 2002 (Oct.) Manual

| | |
|---|---|
| 2A4.1(a) B base offense level | 24 |
| 2A4.1(b)(1) B ransom demand | 6 |
| 2A4.1(b)(2) B serious bodily injury | 2 |
| 2A4.1(b)(3) B dangerous weapon used | 2 |
| 3D1.4 grouping increase | 3 |
| TOTAL OFFENSE LEVEL 37 | |

**GUIDELINE RANGE = 210-262 months (17.5 years - 21.8 years).**

***\*If +2 serious bodily injury is not applied, the 2002 range is 168-210 months (14 years -17.5 years)***

As illustrated above, in 2002, Mr. Delgado's worst-case scenario Guidelines range, assuming the Court overruled the defense objection to serious bodily injury, would be 17.5 years to 21.8 years. In 2002, if the Court granted the defense objection to serious bodily injury, his range would be 14 to 17.5 years. Today the Guidelines recommend a sentence of LIFE for *the exact same offense conduct.*

These calculations show that Mr. Delgado's current Guidelines range, which would condemn a young man to die in prison for non-homicide offenses, is arbitrary and draconian to the point of barbaric. As noted, these dramatic increases to the offense level are not the result of reasoned, empirically based research by the Commission, but instead, are the direct result of Congressional directives which contravene the Commission's purpose and the institutional role.

For this reason, the Guidelines range for Mr. Delgado should be afforded less deference than the other sentencing factors. *See United States v. Nolasco-Ramirez*, 391 F. Apex 309, 311 (4th Cir. 2010) (noting that the sentencing court is "free to consider policy decisions behind the Guidelines, including the presence or absence of empirical data, as part of its consideration of the § 3553(a) factors"); *see also United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject any

Guideline on policy grounds . . . . So long as a district judge acts reasonably, . . . the Sentencing Commission's policies are not binding").

In examining the alternative guideline calculation set forth above, a sentence of 120 months is not a drastic departure from what the range would have been prior to the PROTECT Act, particularly in light of the fact that Mr. Delgado will be deported back to Venezuela after serving his sentence. The goal of the Guidelines is to impose a serious punishment for serious offenses such as kidnapping but not to impose a sentence that far exceeds what is sufficient but no greater than necessary.

A sentence of 120 months will punish and deter Mr. Delgado, but it will take into account that Mr. Delgado is not convicted of kidnapping resulting death nor is he convicted of exploiting children. A sentence of 120 months will also account for the fact that Mr. Delgado will spend a decade of his life from his family, surrounded by people with whom he will not be able to communicate due to language barriers, and at increased risk for predation due to his status as a gay man.

### III.    The conduct in this case could also be accounted for by the robbery guideline, which yields a lower guideline range even after enhancements for injury, abduction, and use of dangerous weapon.

The conduct in this case—unlike the cases the government cites as comparators—could have been charged as an armed robbery. If charged as a robbery, 2B3.1 would apply. Under 2B3.1, the relevant guideline calculation would account for the abduction in this case,[10] and is as follows:

2B3.1(a) base offense level                                        20

---

[10] Application Note 1 to §1B1.1 provides that abduction occurs when "a victim was forced to accompany an offender to a different location." For further discussion on the abduction enhancement at 2B3.1(b)(4)(A), *see* Peery, Caleb, "How Far is Too Far: Analysis of the Abduction Sentencing Enhancement as Applied in Robbery Cases," 29 Geo. Mason L. Rev. 875 (2022) (available at https://lawreview.gmu.edu/print_issues/how-far-is-too-far-an-analysis-of-the-abduction-sentencing-enhancement-as-applied-in-robbery-cases/).

| 2B3.1(b)(2)(D) dangerous weapon otherwise used | 4 |
| 2B3.1(b)(3)(A) bodily injury | 2 |
| 2B3.1(b)(4)(A) abduction to facilitate offense | 4 |
| 3D1.4 grouping increase | 3 |

TOTAL OFFENSE LEVEL 33

**GUIDELINE RANGE = 135-168 months (11.25 – 14 years)[11]**

As demonstrated, the sentencing range for a commensurate robbery offense with applicable enhancements is *nearly three times lower* than that calculated for Mr. Delgado under the kidnapping guidelines.[12] And the difference is simply not accounted for by the conduct in question.

First, the length of detention during this offense is far more comparable to the brief detention in a bank robbery with abduction than to the comparator cases cited by the Government, in which the detentions lasted several days (*United States v. Martinez* and *United States v. Yunis*), months (*United States v. Tchibassa*), or even years on end (*U.S. v. Palmera-Pineda*),[13] and

---

[11] The main distinction from a robbery offense with abduction is in some circumstances knowledge by family members that releasing the individual was contingent upon them sending money, *i.e.* payment of ransom. Even if the Court were inclined to add a +6 for a ransom demand, the adjusted offense level would be a 39, or a guideline range of 262-327 months (22 - 27 years).

[12] A review of the U.S. Sentencing Commission statistics for robbery reveals that the average sentence length for all individuals sentenced for robbery was 111 months, with an average sentence length of 79 months for individuals sentenced for robbery *without* a conviction under section 924(c) (carrying a firearm during the offense – which Mr. Delgado is not alleged to have done here). The average sentence length was 159 months for individuals sentenced for robbery *with* a conviction under section 924(c), i.e. involving the perpetrator carrying or using a firearm during the offense, which again is not the case here. *See* "Quick Facts on Robbery Offenses," U.S. Sentencing Commission, 2023 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Robbery_FY23.pdf).

[13] *See* "Senior Member of FARC Narco-Terrorist Organization Sentenced to Sixty Years for Hostage-Taking Conspiracy" https://www.justice.gov/archive/opa/pr/2008/January/08_nsd_069.html; "Former Hostage Tells of Life in Captivity," NPR News, March 5, 2009 (available at https://www.npr.org/2009/03/05/101469110/former-hostage-tells-of-life-in-captivity).

involved serious aggravating factors, such as abduction of children, use of persistent force and even death, and/or abduction for political gains.[14]

In contrast, there is no evidence that Mr. Delgado and his uncharged coconspirators targeted Americans nor was there any political motivation for these offenses. Quite simply, the members of the conspiracy were looking for fast and easy money, as is the case in most robberies, taking property from the complainants such as phones and wallets and quickly obtaining money through electronic transfers. The victims were released quickly, and the gains were nominal, with a total estimated total loss amount of $12,617.37 for the three victims. Moreover, there is no evidence that Mr. Delgado specifically benefitted from the more substantial ransom payments.

As such, and for the reasons stated *supra* II. i – iv ,the Court should disregard the estimated Guidelines range under 2A4.1, and instead use the Guidelines range above calculated pursuant to 3D1.4 as the starting point for sentencing in this case pursuant to 18 USC §3553.

### IV.    The Remaining Sentencing Factors Support a Sentence of 120 Months.

### i.    Deivy Delgado's History and Characteristics Support a Sentence of 120 Months.

Given Mr. Delgado's unique struggles, his potential for good, and his ultimate deportation back to Venezuela, a sentence of 120 months in this matter is the only sentence that is not greater than necessary, yet sufficient, for the purposes of sentencing.

### A. Deivy came of age in Venezuela at a time of mounting political and economic insecurity.

Deivy Rodriguez Delgado grew up in poverty in the mountainous coastal town of La Guiara during a period of mounting political and economic insecurity in Venezuela. Born on ████ 1994, Deivy was the firstborn son of a lower middle-income family consisting of his

---

[14] *See* section vii, infra, for additional discussion.

father, a police officer, and his mother, a homemaker suffering from persistent health issues. Deivy was later joined by his younger brother ▮▮▮▮ and raised in a modest home containing the bare minimum, pictured below.



*Mr. Delgado's humble childhood home in La Guiara, above and below*

 

The family lived modestly but managed to have their basic needs met for Deivy's early childhood years. However, when Deivy was just 5 years old, tragedy struck. In a series of events known as the "Vargas Tragedy," Deivy's entire town and the surrounding areas were deluged by massive mudslides and destruction triggered by a "once in a thousand years" level rainfall over

the course of ten days.[15] Deivy's home, like thousands of others, was covered in thick mud and the family lost everything. Across the region, an estimated 30,000 people lost their lives, with the vast majority of bodies never recovered – either buried under the mud or swept out to sea.

Then President Hugo Chavez declared a state of emergency and called in the National Guard to assist in the recovery process. Along with hundreds of thousands of others, young Deivy and his family were displaced for months as their town and home was slowly cleaned up and rebuilt. They not only suffered from homelessness as a result of the tragedy, but also acute shortages of food, water, and other basic necessities for months on end during the recovery period.

 

*Images of Deivy's home town La Guiara in the wake of the 1999 Vargas Tragedy*

---

[15] *See* "A Region Erased by the Elements," YouTube (last accessed October 29, 2024) (available at https://www.youtube.com/watch?v=qlUeN66HKqQ); Olmo, Guillermo, "Como fue la tragedia de Vargas, el peor desastre en la historia reciente de Venezuela: 'Creiamos que era el fin del mundo'," BBC News, Dec. 12, 2019 (available at https://www.bbc.com/mundo/noticias-america-latina-50695328. English version: https://www-bbc-com.translate.goog/mundo/noticias-america-latina-50695328?_x_tr_sl=es&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=wapp. ). See also "Vargas tragedy," Wikipedia, available at https://en.wikipedia.org/wiki/Vargas_tragedy; "After Venezuela's Flood," The Economist, December 23, 1999 (available at https://www.economist.com/the-americas/1999/12/23/after-venezuelas-flood).




While Deivy's family was eventually able to rebuild their home and slowly, their lives, life was still far from easy. His mother suffered from chronic health issues all his life and was never able to work, creating additional financial pressures on the family. These pressures were exacerbated when Deivy's father began to suffer health issues himself when Deivy was in his teens as a result of the persistent physical demands of his job as a patrol policeman in town, leading him to undergo serious spinal surgery and to become disabled in 2012. These circumstances—together with the worsening economic crisis in Venezuela, as well as Deivy's repressed sexuality, discussed below—would ultimately lead Deivy to leave Venezuela, like millions of other Venezuelans, in order to help his parents obtain critical medical care and make ends meet.

**B. Deivy remained closeted in his homosexuality for years in a repressive religious conservative home in Venezuela.**

Deivy knew from a very early age that he was gay. However, both of Deivy's parents were religious conservatives, and it was made abundantly clear to him both inside and outside the home that being gay was simply unacceptable. As a result, Deivy harbored his sexuality as a secret for years – a repression that would impact his decision to immigrate to and later remain in the Dominican Republic even after his brutal attack at the hands of the uncharged co-defendant in this case, described further below.

Deivy's father, ███████████, is a devout evangelical Christian who growing up was a "harsh disciplinarian who was strict and on occasion raised his voice," and often resorted to corporal punishment. *See* PSR at ¶78. Deivy shared with the PSR writer one occasion in which he was beaten severely for "wasting" sugar and coffee as a child, but there were numerous other instances in which he was physically punished as well. *Id.* For example, Deivy related another instance to counsel when he took his father's phone to school around the 6th grade, and came home to a savage beating that left him with significant bruising. As he shared with the PSR writer, Deivy "believes that his father's career as a police officer made him an intimidating person." *Id.*



Deivy's father also inflicted additional discipline upon him because of mannerisms or speech his father identified as effeminate, with his father (and sometimes his mother) frequently chastising him for the same or if he dared to cry or show emotion. Counsel has spoken with his father on multiple circumstances, and he speaks brusquely with frequent religious references and overtures.

While Deivy has a closer relationship with his mother, his mother is also a devout Catholic. Throughout his youth, she made it clear to Deivy that she believed in the church's teachings with respect to homosexuality, that homosexuality was immoral, sinful, and wrong. Due to their devout faith, Deivy's parents insisted that he go to church from a young age, where he listened to clergymen rail against the libertine sins of homosexuals who would be damned to hell for their sins. As a result of this dynamic, in which his father was both verbally and physically domineering

–as Deivy would describe, the quintessential "machista" man[16]—as well as deeply conservative and intolerant of homosexuality, Deivy quite simply felt he could not confide in his father nor his mother for that matter–most certainly not about his sexuality, or any perceived weaknesses at all.

As such, throughout his youth, Deivy tried hard to mask his sexuality from not only his parents but also his community, given the high rates of homophobia and LGBTQ discrimination in Venezuela that endures to this day.[17] Venezuela has seen numerous instances of criminalization of homosexuality, from a ban on consensual same sex conduct in the military[18] to mass arrests of individuals at a LGBTQ club last year.[19] As a LGBTQ activist in Venezuela articulated recently,

---

[16] *See e.g.* Cambridge Dictionary definition of "Machismo," as "strong pride in behaving in a way that is thought to be typically male, esp. by showing strength and power." (available at https://dictionary.cambridge.org/us/dictionary/english/machismo); *see also* Hirai, M., Dolma, S., Popan, J., & Winkel, M. (2018). Machismo Predicts Prejudice toward Lesbian and Gay Individuals: Testing a Mediating Role of Contact. Sexuality Research and Social Policy, 15, 497–503. https://doi.org/10.1007/s13178-017-0308-7; *see also* "Machismo and Homophobia," (available at http://challengingmalesupremacy.org/wp-content/uploads/2015/04/Machismo-and-Homophobia.pdf).

[17] Rioseco, Esteban, "LGBTQ Venezuelans Endure Persecution After Disputed Election," Washington Blade, Sept. 10, 2024 (available at https://www.washingtonblade.com/2024/09/10/lgbtq-venezuelans-face-unprecedented-persecution-after-disputed-election/) ("Venezuela's LGBTQ community is in an extremely vulnerable situation due to the increasing repression and systematic human rights violations that President Nicolás Maduro's regime has perpetrated after July 28's disputed election."); *see also* Stewart, Hadley, "Living in Venezuela is Hard: Being LGPT Makes it Harder," Reuters, February 4, 2019 (available at https://www.reuters.com/article/world/living-in-venezuela-now-is-hard-being-lgbt-makes-it-harder-idUSKCN1PT1YH/); Truong, Kevin, "For Some LGBTQ Venezuelans, Fleeing Home Was Their Only Option," MSNBC News, May 10, 2017 (available at https://www.nbcnews.com/feature/nbc-out/some-lgbtq-venezuelans-fleeing-home-was-their-only-option-n757431).

[18] *See* Gonzalez Cabrera, Cristian, "Draconian Law Punishes Gay Sex in the Military," Human Rights Watch (February 3, 2022) (available at https://www.hrw.org/news/2022/02/03/draconian-law-punishes-gay-sex-venezuelan-military) (provision in Venezuela's Military Code of Justice punishes consensual same-sex conduct by military personnel with up to three years in prison and dismissal).

[19] *See* Kessler, Jacob, "Mass Arrest at LGBTQ Club in Venezuela Prompts Outcry Over Discrimination," Al Jazeera, August 10, 2023 (available at https://www.aljazeera.com/news/2023/8/10/mass-arrest-at-lgbtq-club-in-venezuela-prompts-outcry-over-discrimination) (highlighting recent capitulations by the Maduro government to

"[i]n Venezuela, unlike most Latin American countries, no meaningful recognition has been achieved for the LGBTIQ+ population. There is no equal marriage, no identity recognition for trans people, and existing anti-discrimination laws are never enforced in practice."[20] As a result of these dynamics, Deivy harbored the secret of his homosexuality inside, silently struggling with self-acceptance in a family and society that simply did not accept a critical part of his identity.

 

*Deivy at around 10 years old during his confirmation in the Catholic church*

Complicating the dynamic with his mother was that as a result of her chronic and debilitating health conditions, Deivy always felt he had to protect and support her, particularly as the oldest son in the family. Due to their tenuous economic situation, he was frequently reminded of the sacrifices his parents made in order to send him to a small private Catholic school given the

---

evangelical churches and socially conservative groups, who staged protests and parades promoting "family" values as a reaction to Pride Month, the annual LGBTQ celebration).
[20] *Id.*

poor reputation of public schools in Venezuela[21]—a school where the Catholic Church's anti-LGBTQ beliefs were similarly promoted. Deivy was expected to contribute to the family home at an early age and so began working as a tutor for other children. Realizing he had an aptitude for teaching others, he would go on to work as a teacher upon completing his third semester in college, and worked throughout his studies in order to pay for his tuition and help with medical and other expenses at home.

 

*Deivy at his graduation from small Catholic high school ⬛⬛⬛⬛ at the age of 17, with his mother and younger brother*

Deivy managed to keep his sexuality a secret until his late teens, when he was outed inadvertently by his mother. He had used her phone to communicate with someone via text, and

---

[21]*See* Marquez, Umberto, "Venezuela's Educational System Heading Towards Total Collapse, Global Issues, July 10, 2023 (available at https://www.globalissues.org/news/2023/07/10/34207).

she received a message later on that was clearly from a male and spoke with clear double entendre. She confronted Deivy about this and he eventually admitted to her the truth: that he was gay.

Later that night, when his father got home, his mother immediately shared the news with his father while Deivy cowered in earshot. Deivy remembers his father leaving the room and not speaking to him for hours, feeling terrified he was going to end up kicked out of the house and on the street. His father eventually came back around and told Deivy he accepted the situation but did not want to hear about it or see it ever again. He also specifically instructed Deivy to keep this information within their nuclear family.

True to form, his parents never spoke with Deivy again about his sexuality and made sure to in turn harbor this secret form the extended family out of purported fear that Deivy would be mistreated or rejected – though Deivy suspects it was also in large part due to their shame. His mother confirmed this version of events and was otherwise not interested in discussing the issue of his sexuality with Counsel.

Deivy lived at home until his migration to the Dominican Republic and, as a result of the above circumstances, would not go on to have a romantic partner until he left Venezuela many years later.

**C.   The economic crisis in Venezuela caused Deivy to migrate to the Dominican Republic in search of better economic opportunities and the freedom to live as a gay man.**

While Deivy recalls relative stability after the family recovered from their traumatic displacement during the Vargas Tragedy, life became far more unstable once again around 2013, as Venezuela began to plunge rapidly into economic crisis. This crisis touched Deivy's family directly as it did millions of other Venezuelans, and ultimately led him to immigrate to the Dominican Republic to support his family.

While the political and economic situation in Venezuela was perhaps always tenuous in

recent decades, the economic situation began to deteriorate appreciably after the death of Hugo Chavez in 2013, when Deivy was around 18 years old. Chavez, a divisive figure internationally and certainly in the United States, aimed to redistribute wealth during his reign, nationalizing key industries, including the oil industry, and investing in social programs throughout Venezuela.[22] At the time of Chavez's death from cancer in 2013, his Vice President, Nicolas Maduro, assumed power after a tight election.[23] During the ensuing decade, President Nicolas Maduro has engaged in what political opponents believe to be unlawful conduct in order to maintain power,[24] with his regime characterized by increasing authoritarianism, political repression, and allegations of election fraud.[25]

Beginning acutely in 2014, Venezuela's economy, heavily reliant on oil exports, was severely impacted by the decline in oil prices, leading to rampant hyperinflation and scarcity of basic goods across the country that has only worsened with time.[26] Hospitals have struggled with lack of essential supplies, and chronic fuel shortages have exacerbated the situation.[27]

---

[22] *See e.g.* "Venezuela's Chavez Era," Council on Foreign Relations [last accessed October 29, 2024] (available at https://www.cfr.org/timeline/venezuelas-chavez-era).

[23] Id.

[24] *See e.g.* Roy, Diana, "Venezuela: the Rise and Fall of a Petrostate," Council on Foreign Relations, last updated July 31, 2024 (available at https://www.cfr.org/backgrounder/venezuela-crisis).

[25] Buschschluter, Vanessa, "Venezuela Crisis in Brief," BBC News, August 5, 2024 (available at https://www.bbc.com/news/world-latin-america-48121148).

[26] "Barter and Dollars the new reality in Venezuela," The Guardian, March 14, 2019 (available at https://www.theguardian.com/world/2019/mar/13/venezuela-hyperinflation-bolivar-banknotes-dollars).

[27] Doocy, Shannon, et al. "Venezuela: out of the headlines but still in crisis," World Health Organization Bulletin, August 2022 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9306381/#:~:text=Access%20to%20health%20care%20and,10.4%20million%20with%20chronic%20diseases) (Access to health care and medicines remains limited due to health system capacity and supply chains, as well as high out-of-pocket expenses. In mid-2021, an estimated 18.8 million Venezuelans lacked access to health services, including 10.4 million with chronic diseases).

These issues, coupled with international sanctions and the later impact of the COVID-19 pandemic, have fueled a devastating humanitarian crisis, with severe shortages of basic goods such as food, drinking water, gasoline, and medical supplies.[28] According to a November 2022 survey, 3 out of every 4 people in Venezuela live in extreme poverty.[29] Since 2014 and as of 2023, nearly eight million Venezuelan refugees have fled to neighboring countries and beyond – among them Deivy himself –with the exodus referred to as the "largest displacement crisis in the world."[30] Overall, the economic crisis has pushed millions of Venezuelans into dire circumstances, with little hope for immediate improvement.

The deepening economic crisis in Venezuela has indelibly impacted Deivy and his family. As the crisis worsened, Deivy worked incredibly hard to fund and obtain his Bachelor's degree in Education in 2017, and soon he was soon teaching at a local high school. *See* Exhibit 1, Letters of Family attesting to his work ethic; Exhibit 2, College Degree and Transcript; Exhibit 3, Letters from Employers. However, his salary was modest (earning 2,300 pesos a month, or the equivalent of $63), increasingly worth less and less given the rampant hyperinflation, and barely enough to help pay for basic necessities as the economy in Venezuela continued its steady downslide.

Worsening matters for his family still was that shortly before the crisis, Deivy's father had spinal surgery in 2012 to repair persistent injuries he had experienced during his

---

[28] "Venezuela in Crisis: Three in Four in Extreme Poverty, Study Says," BBC News, September 30, 2021 (https://www.bbc.com/news/world-latin-america-58743253).

[29] See Munoz, Betilde et al., "The Persistence of the Venezuelan Migrant and Refugee Crisis," Center for Strategic and International Studies, November 27, 2023 (available at https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis#:~:text=The%20outflow%20of%20refugees%20and,Ukrainians%20outside%20of%20their%20countries).

[30] *Id.*

decades on the job as a police officer. After the surgery, he was considered disabled and forced into early retirement, receiving only a nominal wage as part of his police pension, which today is equivalent to approximately $6 U.S. dollars per month. Due to rampant inflation, the loss of his job, and the increasing worthlessness of the bolivar, his father tried to do side jobs in bricklaying and home construction to pay for their basic needs, relying on heavy doses of painkillers to do so and only worsening his condition.

His mother on her end has endured several health-related disabilities all Deivy's life, including an enlarged thyroid, diabetes, hypertension, migraines, and in recent years arthritis. She has required several surgeries due to the growth of masses in her body, ███████  ███████████████ and requires a pricey cocktail of monthly medications. Her medication alone, pictured at right, costs approximately $140 U.S. dollars a month.

Ultimately, as financial pressures mounted, the family decided that Deivy would immigrate specifically to the Dominican Republic for several reasons: 1) due to the steady influx of tourism and U.S. dollars, the economy was relatively speaking better than Venezuela; 2) it was a Spanish speaking country; and 3) Deivy could obtain a tourist visa to travel there. For Deivy, there also was an important fourth reason: that in the Dominican Republic there was more acceptance of the LGBTQ community and a larger "out" population as compared to Venezuela– though considerable lingering homophobia as well.

In 2017, Deivy's family was able to request a loan from a family member, and Deivy immigrated to the Dominican Republic. He first stayed for four months to assess whether it

was viable and was able to obtain employment during that time. He returned to Venezuela to collect additional items for the move and relocated permanently to the DR shortly thereafter.

After moving to the DR permanently later in 2017, Deivy realized he had underestimated how challenging it would be to live essentially as an undocumented immigrant in the DR without work permission. For approximately two months, he was able to obtain a position as a contract teacher at a local high school in Santo Domingo and earned approximately $200 (USD) monthly. However, his contract was not renewed due to his lack of immigration status. He continuously sought teaching positions but was turned down again and again due to his lack of work authorization. On multiple occasions in the early years, he ended up virtually homeless due to lack of income, with little to show for his sacrifices. He prioritized sending what money he could make back to his parents, who were struggling beyond measure. *See* e.g. Ex. 1, Family Letters, at p. 2, 4 and 6.

On the positive side, once in the Dominican Republic, while he struggled being away from his family, Deivy was finally able to live his truth for the first time as a gay man. Soon he entered a relationship with his first ever boyfriend. However, that relationship would quickly become violent, with his partner physically abusing him and berating him particularly when he drank, which was often. Due to Deivy's vulnerable status in the DR and financial instability, he ended up staying with this boyfriend for over a year and enduring his abuse just so he could have a roof over his head and focus on sending remittances back home. In time, through his first boyfriend's connections, Deivy eventually began working as a taxi driver—and they would finally separate thereafter.

Around this time, Deivy learned that his mother would require surgery to remove a

tumor ██████████ – which she would later go on to need a second time – with the surgery costing hundreds of dollars. As his family explained, in Venezuela as the crisis deepened, it was impossible to obtain surgery unless one paid for the space, surgical tools, and medications required, as well as paid the doctors directly. In his mother's case, his family ultimately arranged for the surgery through a nurse that they knew who was able to ask a doctor to accommodate the surgery. This in turn created extreme pressure on Deivy to generate income to support the family. Fearing for his mother's health, Deivy worked relentlessly to send money from the Dominican Republic in order to arrange for the surgery.

Around this same period Deivy met his long-term partner, ██████ and began building what he describes as the first healthy relationship he's ever had. They felt an immediate connection, and Deivy soon forged strong bonds with his family as well which they attest to in their attached letters. *See* Exhibit 1 at pp. 2, 5 and 7.

### D. Deivy suffered a violent attack at the hands of the uncharged ringleader of this conspiracy, causing significant trauma and psychological strain.

Deivy's steady taxi work finally provided some stability, but would unfortunately introduce him to the uncharged codefendant and ringleader of this conspiracy, with whom he shared a taxi for some time before being viciously attacked by the man and threatened with death. Mr. Delgado had recently confronted him about some inconsistencies in the mileage and shareable earnings the man had been reporting from his shift with the taxi, which apparently led him to violence.

On the day of the attack, as Deivy was finishing up his taxi shift, the ringleader of the conspiracy jumped into the backseat and held him at knifepoint while he was driving. As Deivy attempted to get away, he threatened him then attacked him with a knife, slashing Deivy's throat and lacerating his arm with five violent gashes. His assailant then jumped out of the car, leaving

Deivy thinking he might die, with blood streaming from his throat and arm. Deivy confirmed the attack to the PSR writer in this case. *See* PSR at §83 (The defendant reportedly has a scar on his neck that resulted from an assault during which his assailant slashed his neck. He was reportedly in surgery for 12 hours to repair the injury and the surgery occurred in the Dominican Republic").

Fortunately, Deivy was driving near a hospital when the attack occurred. In shock, he managed to pull his sweater tightly around his neck and make it inside where he underwent immediate surgery to address and close the wounds. He required multiple medical interventions due to the depth of the incision and subsequent infection, causing medical professionals to later have to reopen and clean the wounds and suture them again.

Deivy describes this time in his life as the lowest of the low, living in fear while simultaneously struggling to obtain the money for antibiotics and necessary medications, get physical therapy for his arm to regain function, and heal. He was far too afraid to tell his family about what happened, lest his father claim he was weak and force him to return to Venezuela to live a life of repression and poverty with persistent concerns for their health and wellbeing. To this day, and as the jury saw in this case, his throat and arms display visible thick and jagged scarring laying testament to the brutality and extent of the attack.

***Photo taken by Special Agent Valdes during trial of the scar across his throat***



In the wake of his violent attack, Deivy struggled to find a path forward. He was wracked with anxiety, hypervigilant, having difficulty sleeping, and had frequent nightmares—experiencing what appear to be symptoms of PTSD in the wake of the brutal

attack. In discussing these issues with counsel and completing a PTSD screening tool provided by the U.S. Department of Veteran Affairs, Mr. Delgado reported that he experienced the majority of the PTSD symptoms listed in the DSM-5,[31] and continues to experience many to this day. Unsurprisingly, Deivy did not then and still has not been able to access mental health support for his trauma or symptoms, though he has requested mental health support at the jail due to "anxiety" to no avail. *See* PSR at ¶ 88.

At the time these events occurred, Mr. Delgado was under significant pressure as essentially an undocumented immigrant in the Dominican Republic, struggling economically and with significant pressure from his family in Venezuela, who was also suffering due to the worsening economic crisis there. Around this same time, his mother underwent multiple surgeries for masses ███████ putting increased pressure on Mr. Delgado to send remittances back to his parents to pay for her medical care and support the family.

At the same time, Deivy was now in a relationship with his partner ██████ and had become close to his entire family, who were incredibly welcoming and accepted him in a way his own family never had. As time went on and their relationship grew, the two were able to

---

[31] *See* Description of Post Traumatic Stress Disorder, National Institute of Mental Health, available at https://www.nimh.nih.gov/health/publications/post-traumatic-stress-disorder-ptsd. In order to be diagnosed with PTSD, the individual needs to have a specified number of 20 symptoms in each of four areas. See e.g. Exhibit 1.3-4, DSM-5 Diagnostic Criteria for PTSD, available at https://www.ncbi.nlm.nih.gov/books/NBK207191/box/part1_ch3.box16/. These symptom areas are: *persistent re-experiencing of the traumatic event* (e.g., intrusive thoughts, flashbacks, nightmares), *effortful avoidance of distressing trauma-related stimuli* (e.g., avoiding thoughts, feelings, people, places, activities, etc.), *negative alterations in cognitions and mood* (e.g., persistent negative beliefs and expectations, distorted blame, negative trauma-related emotions, diminished interest in activities, detachment from others), and *alterations in arousal or reactivity* (e.g., irritable or aggressive behavior, sleep disturbance, hypervigilance, exaggerated startle response). It is possible that an individual could be diagnosed with PTSD with as few as six of these symptoms.

finally move in together using a loan from ███ aunt, while scrabbling together their meager

wages to buy basic things for the home on layaway. Deivy continued finding taxi work to send

money back to Venezuela as economic circumstances there worsened due to the pandemic, and

as his mother needed subsequent surgery and follow-up medical care.

       Out of both fear and a desire to protect them, he never told his loved ones the details

about what had happened to him or who had done it. When he was arrested and charged, he

continued to want to protect ███ and his family from danger—which ultimately led him to go

to trial in this case. Deivy was incredibly fearful that this same individual, who had nearly meted

him death, would harm or kill his long-term partner and his family, who he considered his own

family, given the impunity upon which criminal actors operate in the Dominican Republic.[32]

       While Deivy managed to stay under the radar and avoid run-ins with the perpetrator of the

attack for some time, he would later be confronted and threatened at gunpoint once again that if

he did not assist him, he would finish the job he started before with Deivy and would target his

partner as well.  As a foreigner and a gay man in the Dominican Republic, Mr. Delgado feared that

going to the Dominican police would not be a viable option for him—a sentiment shared by many

in the country.[33] He also considered trying to get help from the embassy, but his concern was with

the Dominican police, who he knew from his own experience were corrupt and untrustworthy. He

---

[32] See e.g. "Study Reveals 75 Percent of Country's Companies Have Little or No Trust in the Police," Dominican Today, October 21, 2021 (available at https://dominicantoday.com/dr/economy/2021/10/05/study-reveals-75-of-countrys-companies-have-little-or-no-trust-in-the-police/); Guittard, Robin, "The National Police: the Shady Side of the Dominican Republic?" Amnesty International, May 2013 (available at https://www.amnesty.org/en/latest/campaigns/2013/05/the-national-police-the-shady-side-of-the-dominican-republic/); "Dominican Republic: 'Shut up if you don't want to be killed!': Human rights violations by police in the Dominican Republic," Amnesty International, October 25, 2011 (available at https://www.amnesty.org/en/documents/AMR27/002/2011/en/)
[33] Id.

feared they would blame him or try to deport him if he reported it. He also investigated whether there was a way he could get papers to immigrate to Spain, but learned it would cost upwards of $7,000, which he quite simply could not afford.

Deivy now understands that had he confided in people about what was happening, he may have been able to figure out a way to escape, to get out from under this threat. Instead, he felt ashamed and paralyzed, blaming himself on some level, and feeling both damned if he stayed and damned if he fled back to Venezuela where repression and poverty awaited. He feared for his life, but also feared that his mother would suffer irreparable and fatal health consequences if he returned to Venezuela with no ability to support her medical needs.

Deivy also felt tremendous pressure to provide for his family back home as a way to finally obtain their approval given their deep-rooted disappointment and shame about his sexuality. That same constant pressure to conform to heteronormative standards that Deivy experienced throughout his youth led to him feeling rejected and isolated, and he deeply feared having to return to that environment.

It is well known that the repression of homosexuality as Deivy experienced can have profound psychological consequences. Individuals who suppress their true sexual orientation often experience internalized homophobia, characterized by self-hatred and shame.[34] This can lead to a range of mental health issues, including depression and anxiety, as Deivy himself experienced. Furthermore, the constant need to conceal one's identity can result in feelings of isolation, alienation, and a diminished sense of self-worth.[35] Repressed homosexuality can also

---

[34] Herek, G. M. (Ed.). (1998). *Stigma and sexual orientation: Understanding prejudice against lesbians, gay men, and bisexuals.* Sage Publications, Inc.
[35] Meyer IH, Dean L. Internalized homophobia, intimacy, and sexual behavior among gay and bisexual men.

contribute to difficulties trusting others, as was certainly the case with Deivy and was only compounded by his trauma.[36]

Deivy's decisions are also understood in the context of the trauma he experienced –not only acutely from the attack, but chronically throughout his childhood. As detailed above and in addition to his traumatic displacement at the age of 5, Deivy was exposed to at least three of the ten distinct adverse childhood experiences known to impact mental health and social outcomes in the future, including: *enduring poverty*; *emotional neglect;* and *physical abuse* (perpetrated by his father),[37] in addition to other adverse traumatic experiences such as the sudden homelessness and displacement during the Vargas tragedy and the persistent repression and vilification of his sexuality.

Research shows that individuals who are exposed to adverse childhood experiences (ACEs) have poorer outcomes across a broad range of measures, including medical issues, mental health problems, social and emotional problems, and financial problems—and typically face higher rates of incarceration.[38] Studies also confirm that if an individual is exposed to trauma in childhood, they are more susceptible to developing PTSD in adulthood,[39] which Deivy appeared to suffer and continues to suffer symptoms of in the wake of the attack.

---

[36] *Id.*

[37] Chapman DP, Dube SR, Anda RF, "*Adverse childhood events as risk factors for negative mental health outcomes*," Psychiatric Annals 2007;37(5):359–364.

[38] *Id.*

[39] *See e.g.* Breslau, Naomi, "Previous Exposure to Trauma and PTSD Effects of Subsequent Trauma," American Journal of Psychiatry, 1999 (available at https://psychiatryonline.org/doi/10.1176/ajp.156.6.902#:~:text=Furthermore%2C%20previous%20events%20involving%20assaultive,of%20PTSD%20from%20subsequent%20trauma (finding that a history of any previous exposure to traumatic events was associated with a greater risk of PTSD from the index trauma in adulthood, and finding subjects who experienced multiple events involving assaultive violence in childhood were more likely to experience PTSD from trauma in adulthood).

It is well documented that PTSD itself can impair executive functioning, which is responsible for problem-solving, planning, and organizing.[40] Individuals with PTSD are in a state of chronic arousal, meaning that the endogenous secretions that cause an increase of function in the part of the brain associated with fight/flight/freeze response also cause a relative closing down of the frontal lobes, which are responsible for executive functions.[41] PTSD can also put individuals at risk of engaging in reckless behavior, falling in the domain of *alterations in arousal or reactivity*.

In this sense, it is likely that the posttraumatic stress experienced by Mr. Delgado, as well as his direct and extreme fear of the perpetrator, inhibited his capacity for judgment in the wake of the attack. In other words, Mr. Delgado's behavior and poor judgment are tied to his trauma history, and specifically his victimization at the hands of the uncharged codefendant, who upon information and belief remains at large in the Dominican Republic.

His trauma and extreme anxiety may have also allowed him to disassociate from reality at times as he attempted to avoid alterative terrible outcomes – either returning to Venezuela to live in repression and poverty, with persistent fears for his mother's unmet health needs, or his and his partner's deaths. Dissociation is a well-documented trauma response and is described as "the most direct defense against overwhelming traumatic experience."[42]

Mr. Delgado has indicated that he must relive the trauma of his attack frequently given the visibility of his scars, with many people he meets asking him how he got them. He is immediately

---

[40] Weiss, Sandra J. "Neurobiological alterations associated with traumatic stress," *Perspectives in Psychiatric Care*. 2007; Volume 43, issue 3.

[41] *Id. See also* Sherin & Nemeroff. Post-traumatic stress disorder: the neurobiological impact of psychological trauma. *Dialogues in Clinical Neuroscience. 2011 Sep; 13 (3); 263 – 278.*

[42] *See e.g.* Lanius, Ruth, et al. "Dissociative Subtype of PTSD," U.S. Department of Veterans Affairs National Center for PTSD (available at https://www.ptsd.va.gov/professional/treat/essentials/dissociative_subtype.asp (discussing the role of dissociation as the most direct defense against overwhelming traumatic experience).

stricken with anxiety when this happens, particularly in the prison, as it leads him to recall both the attack itself and his vulnerability.



Mr. Delgado continues to suffer from the trauma he experienced to this day and will be continually reminded of it as he endures a significant sentence in federal prison, where violence and contraband is common.

### E. Deivy's past demonstrates that he is capable of redemption and living an honorable life going forward.

Deivy Delgado is more than the events of this case, and is capable of living a positive, productive life in the future as his past demonstrates. As the attached letters attached attest, Deivy was universally known as a "hardworking," "respectful," "studious," "kind," and "supportive of others," "generous," and "a good son, brother and friend" who is "inclined to help others with their needs." *See* Ex. 1, Letters of Family and Friends. His family and friends in both Venezuela and the Dominican Republic spoke in their letters to how he would bend over backwards to send money back to support his parents and do errands and otherwise support his loved ones however he could – taking ████'s brother and other family members to medical appointments and other places as needed. *Id.*

████ mother and sister, who are aware of the offenses in this case, spoke in their letters about how they consider Deivy to be family, forgive him for his mistakes, are confident he will learn and never again repeat them, and welcome back into their lives. ████ and his family also spoke about the pressures Deivy felt to support his parents' medical and other needs, to the point

where his mother-in-law ██████ would sometimes find him smoking cigarettes "when he was worried or sad" to help manage the anxiety of those pressures.

While the Government attempts to characterize Mr. Delgado as someone who "ha[s] a taste for gold jewelry and other luxury items," the truth is that Mr. Delgado lived in relative poverty even in the Dominican Republic, having to request loans and get basic items on layaway in order to maintain a home, all while struggling to have enough money to send back to his family in Venezuela for their basic necessities and medical needs. As the Court can see from the photos above of his family home today, the family still lives in poverty.

Throughout this case, Deivy has spoken tearfully and with shame about this case and circumstances, and for the impact it has had on all of the people who he loves and who love him in return. He frequently breaks down in tears, remembering his own fears and fearing for their wellbeing. He left Venezuela hoping to avoid ruin and falling into criminality to survive, and now finds himself before this Court in a worse situation than he had ever imagined. As he stated to counsel, "I have fallen in the same hole I was trying to avoid."

Since his incarceration, Deivy has strived to do what he can to show he is serious about rehabilitation and contributing positively to this world, even as he grapples with unaddressed depression, anxiety and trauma while detained. He has completed eight certificate courses during his detention, with coursework ranging from mathematics, financial literacy, legal process, and anger management to cognitive behavioral therapy. His past history of diligence in obtaining his college degree despite considerable adversity is testament to his ability to move past this. At just 30 years old, he has much to contribute positively to this world, as the letters from his family and friends attest.

Deivy's last two years in custody at Northern Neck Regional Jail have otherwise been fraught, with him once again withholding his sexuality to avoid falling victim to predation as a gay man. He has experienced a series of medical issues which have gone unaddressed at the facility despite numerous requests on his end, and even requests from Counsel, to include migraines, vision issues, stomach pain, and other concerns. He is unable to afford basic hygiene items like soap and shampoo, only available for purchase, as his family has no money to contribute to his commissary. He has also been unable to speak with his loved ones with any regularity due to the lack of money in his account. These isolating circumstances will persist as he transitions to the BOP, given his family's poverty and their location abroad.

ii.    **This Court should vary downward due to the additional challenges Deivy will face in prison as a gay man.**

This Court should vary downward significantly as a result of the additional hardships he will face in prison as a gay man. People who identify as LGBTQ+ and are in prison often experience many additional challenges.[43] Once in prison, there is systemic discrimination against imprisoned LGBTQ+ people and a lack of understanding and concern regarding their care, treatment, and support needs.[44] They are also at heightened risk of sexual violence and harassment from both fellow inmates and prison staff.[45]

In a recent survey of LGBT+ inmates, 83 percent of respondents faced verbal harassment by fellow inmates, while 70 percent experienced discrimination and verbal harassment by prison staff. The survey also found that LGTBQ+ people are more than six times as likely as the rest of

---

[43] *See* Donohue, Grainne, et al. "Views and Experiences of LGBTQ+ People in Prison Regarding Their Psychosocial Needs: A Systematic Review of the Qualitative Research Evidence," Int J Environ Res Public Health, September 2021 (available at 10.3390/ijerph18179335).

[44] *Id.*
[45] *Id.*

the prison population to be sexually assaulted. And 85 percent of respondents indicated they had spent time in solitary, ostensibly for protection but instead suffering the impacts of isolation and severe mental health impacts.[46] The lack of adequate protection and support systems exacerbates their vulnerability. Additionally, the fear of being outed can lead to a sense of hopelessness – an issue all too familiar for Mr. Delgado.

Harsh conditions of detention can warrant a downward variance. *See e.g. United States v. Brinton*, 139 F.3d 718 (9th Cir. 1998) (harsh pretrial conditions may warrant departure). Not only has Mr. Delgado suffered medical neglect, isolation, and exacerbation of mental health issues while detained, he will continue to face a heightened risk of sexual assault, discrimination, and further isolation as he does his time in the Bureau of Prisons. For all of these reasons, a downward variance to 120 months is appropriate in this case.

### iii. This Court should vary downward due to the impact Mr. Delgado's incarceration will have on his mother and her ill health.

This Court should also vary downward due to the impact of Mr. Delgado's protracted incarceration on his aging parents and their health, particularly his mother. Since his incarceration, his family has struggled to afford medical care for his mother's numerous conditions, and his father has been forced to work backbreaking hours in bricklaying despite his spinal injuries to try to afford her medical care. His mother shared that there have been months when they have simply been unable to afford her numerous medications, and she has had to cut pills in half or forego the medications entirely.

---

[46]*See* Johnson, Hannah, "'Being Gay in Prison Is Ten Times Harder': Inmates Tell of Abuse, Use of Solitary," Progressive Magazine, June 28, 2017 (available at https://progressive.org/latest/%E2%80%98being-gay-in-prison-is-ten-times-harder%E2%80%99-inmates-tell-of-ab/).

Various courts have found it appropriate to take into account the effect of incarceration on the well-being of a detainee's family members. *See Rita v. United States,* 551 U.S. 338, 364-65 (2007) (family ties proper consideration under § 3553(a)); *In Re Sealed Case*, 292 F.3d 913 (D.C. Cir. 2002) (district court may properly consider "defendant's acceptance of responsibility, her desire to seek rehabilitation, and her family and community ties" in a totality of the circumstances analysis even though Commission considered these factors separately); *United States v. Johnson*, 964 F.2d 124, 128-29 (2d Cir. 1992) (departure warranted based on "need for defendant to provide for and support his family both financially and emotionally"); U.S.S.G. § 5H1.6 (family ties and responsibilities).

A downward variance is further appropriate in this case due to his mother's ill health and his inability to provide for and support her and his father while incarcerated. The negative consequences of Deivy's protracted absence to incarceration are far worse in his family's circumstances given the abysmal economic conditions in Venezuela, their age, and the likelihood that their health and circumstances will only worsen with age.

### iv.    This Court should further vary downward because Mr. Delgado will serve additional time in both criminal and immigration custody and will face deportation to grim conditions as a result of his conviction in this case.

In relevant part, Title 18 USC § 3624(c) authorizes the U.S. Bureau of Prisons, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed twelve months of the last 10 percent of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry to the community. The DC Circuit has ruled that a downward departure may be appropriate if the defendant's status as a deportable alien is likely to cause fortuitous increase in the severity of confinement. *U.S. v. Smith,* 27 F.3d 649, (307 US App. DC 1994).

First, Mr. Delgado is almost certain to be deported once he is finished serving his criminal sentence. While Mr. Delgado was brought to the U.S. and paroled in by the U.S. government for the purpose of prosecution after being falsely told by law enforcement in the Dominican Republic that he would be deported to Venezuela, that parole status lapsed when he was detained in this case. As a result, he is now considered a "deportable alien," despite that he did not arrange nor ever seek to come to the United States. This fact will impact both his programming and release options while serving time at the Bureau of Prisons, and appreciably lengthen his detention as compared to a similarly situated U.S. citizen.

After Mr. Delgado serves his sentence at the Bureau of Prisons, he will be transferred to immigration custody at a jail managed by Immigration and Customs Enforcement, where he will wait weeks or even months to be deported back to Venezuela. Furthermore, even in the unlikely event he seeks to fight his deportation, he is only potentially eligible for deferral of removal under the Convention Against Torture – relief he is practically certain not to be granted.

First, the kidnapping conviction in this case will be considered an aggravated felony under the immigration law.[47] As a result, the only form of relief from deportation that could remain available to Mr. Delgado would be deferral of removal under the Convention Against Torture.[48] Deferral of removal requires proof that it would be more likely than not that Mr.

---

[47] See 8 USC § 1101(a)(43)(B), INA § 101(a)(43)(B).

[48] *See generally* Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted and opened for signature Dec. 10, 1984, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "CAT"). In order to be eligible for withholding of removal under CAT, an individual must prove it is more likely than not that they will be tortured if deported to their home country. However, conviction for a "particularly serious crime" will bar eligibility for withholding under the CAT. There are no criminal bars to deferral of removal under CAT. *See e.g. Matter of G-A-*, 23 I&N Dec. 366, 368 (BIA 2002).

Delgado would be subject to the equivalent of torture if deported to Venezuela. According to Department of Justice statistics, deferral of removal under the Convention Against Torture is granted to fewer than one percent of all applicants nationwide as of 2017.[49] Based on Counsel's prior experience representing clients in immigration claims and the facts as applied to Mr. Delgado's case at this time, Counsel believes that it is extraordinarily unlikely that Mr. Delgado will be granted relief under the CAT.

Mr. Delgado is also certain to be apprehended by immigration authorities at the conclusion of his criminal sentence. The Bureau of Prisons fully cooperates with ICE by accepting ICE detainers, notifying ICE when an individual is set to complete their sentence, and holding the individual in BOP custody for ICE to pick them up from the facility. Once in ICE custody, Mr. Delgado will be held without bond by immigration authorities while his removal proceedings are pending, as this conviction subjects him to mandatory detention. *See* INA § 236(c)(1)(A). Even when an individual elects not to contest deportation, they are often still held in ICE custody for weeks or even months prior to actual deportation to their home country as ICE arranges the logistics of their deportation. As a result, Mr. Delgado will spend additional time in immigration custody awaiting deportation at the end of his time at the BOP.

Mr. Delgado will also spend additional time in prison as compared to a similarly situated U.S. citizen while serving his sentence in the BOP. Mr. Delgado, as in *Smith*, could not be released early due to an immigration detainer, resulting in up to an additional 12 months or more in prison compared to a similarly situated individual without an ICE detainer, who might be

---

[49] *See* U.S. DEP'T. OF JUST., FY 2016 STATISTICS YEARBOOK at M1 (2017), *available at* https://www.justice.gov/eoir/page/file/fysb16/download (noting that only 140 out 37,060 applications for deferral of removal under the Convention Against Torture were granted in that year).

eligible for a halfway house or home confinement during that time. *See e.g.* 18 U.S.C. 3624(c)(2).

Further, his status as a deportable alien will make his time in BOP custody significantly more difficult. Although Mr. Delgado has no criminal history, it is Counsel's understanding that he is barred from assignment to a minimum-security prison because of his status as a "deportable alien"[50]--and despite his lack of criminal history, may even be placed in a high security penitentiary as a result of the nature of this conviction. As a "deportable alien" with a detainer, Mr. Delgado will only be eligible to participate in occupational education programs if BOP "resources permit after meeting the needs of other eligible inmates," which is almost certain not to occur.[51] Finally, Mr. Delgado will be ineligible for early release to a halfway house or other community confinement, resulting in a substantially longer prison sentence.[52]

This Court can consider negative collateral consequences and the increased harshness in conditions of confinement that Mr. Delgado may suffer as a result of his conviction in this case in determining the appropriate sentence. Specifically, the District of Columbia Circuit has recognized that a departure may be appropriate for non-citizens without lawful status in the United States because the Bureau of Prisons' regulations provide for differential treatment for these inmates. *See United States v. Smith*, 27 F.3d 649, 655-56 (D.C. Cir. 1994) (stating that departure "may be appropriate where the defendant's status as a deportable alien is likely to

---

[50] Federal Bureau of Prisons Program Statement 5100.08: Inmate Security Designation and Custody Classification, Ch.5, p.9. (Sept. 12, 2006). Available at https://www.bop.gov/policy/progstat/5100_008.pdf.
[51] Federal Bureau of Prisons, Program Statement 5353.01: Occupational Education Programs, at 3 (Dec. 17, 2003). Available at https://www.bop.gov/policy/progstat/5353_001.pdf
[52] *Lartey v. U.S. Dep't of Justice*, 790 F. Supp. 130, 133 (W.D. La. 1992) (noting that 18 U.S.C. § 3624(c), which directs release to halfway houses at the end of a prison term, does not apply to deportable aliens).

cause a fortuitous increase in the severity of his sentence"). *See also United States v. Rodriguez,* 676 F.3d 183, 187 (D.C. Cir. 2012) (in which the Government noted in its sentencing memorandum that appellant was eligible for a so-called *Smith* departure because of his status as a deportable alien—reducing his sentence by "up to six months of incarceration").

> a.  **The Court should consider that Deivy's sentence will be uniquely punishing because he is a Venezuelan citizen, far from home and unable to visit family**.

Moreover, Deivy's time at the BOP will be all the more challenging given that he does not speak English and will thus serve a lengthy sentence around people with whom he will not be able to meaningfully communicate. Additionally, while most U.S. prisoners are able to receive visits from family members, Deivy's family and loved ones will not be able to travel from Venezuela or the Dominican Republic to see him due to the lack of immigration permission to travel to the U.S. Nor will they be able to support him through commissary or phone payments due to their poverty, only increasing Mr. Delgado's isolation and vulnerability. These are the types of deprivations which will further increase the severity of Mr. Delgado's sentence and therefore warrant a downward variance under *Smith*.

Lastly, Mr. Delgado is also deeply concerned about his safety when he is ultimately deported to Venezuela. As the Court knows, the country is in turmoil, the economy is in shambles, and the government has been unable to gain control of the violence that has plagued the country. As a deportee with a serious criminal record, he fears he will be a target for violence and will not be able to rely on the police for protection. Furthermore, his parents are aging, and given their health, may not make to see him in person ever again.

All of these circumstances constitute additional severe consequences that will come as a result of his conviction in this case. Here, Mr. Delgado faces certain increased severity in his confinement as well as a host of additional negative consequences detailed above as a result of his

status as a "deportable alien," and the Court should grant a significant downward departure or variance in acknowledgement of the same.

**v.      The nature and circumstances of the offense.**

The Court is familiar with the facts of this case, having presided over the trial**.** Mr. Delgado was convicted of arranging dates using the application, Grindr. Once the date was in his car, another individual jumped in the car and the two men held the victims up at knifepoint and demanded that the victim contact loved ones to transfer cash into various accounts.

No victim was seriously injured. Each victim was released after a few hours. One victim testified that his assailants dropped him off close to his hotel and his brother testified that the assailant messaged him to notify that his brother was safe. Trial Tr., 12-5-23, p. 127, 171.   As detailed in prior sections above, the offenses involved relatively small monetary losses.

At trial, Mr. Delgado did not testify. He did not attempt to slander the victims or suggest that they were lying or exaggerating their experiences.

What is clear is that at the time of these offenses, Mr. Delgado was living on the margins as a Venezuelan refugee in the Dominican Republic. Ultimately, when he was brought to the United States to face prosecution, he elected to go to trial primarily out of concern for his loved ones' safety.

As highlighted further below, the circumstances of the offenses require a sentence far below the Guidelines calculation of life espoused in the PSR when compared to factually similar cases and in light of the foregoing.

**vi.      A Guidelines-sentence will create a dramatic disparity with factually similar cases.**

Cases involving decidedly more culpable conduct, regarding the number of victims and/or the duration of the incident, have resulted in considerably lower sentences than what the government has requested for Mr. Delgado.  A sampling of such cases is as follows:

*United States v. Samson Jolibois*, 13-cr-303 (LO):

Jolibois pled guilty of kidnapping two Americans in Haiti.  Jolibois kidnapped his first victim outside of a residential area in Haiti. Jolibois used physical violence to force his first victim into a car at gunpoint. The victim was threatened and her family was forced to pay over $20,000 in ransom money. After six days of captivity, his first victim escaped. Only a few days later, Jolibois kidnapped his second victim from her family residence. During the kidnapping, Jolibois assaulted several members of her family, and his confederate sexually assaulted the victim's niece. The second victim was rescued by law enforcement after three days of captivity.[53] Jolibois was initially sentenced to 192 months imprisonment, but after testifying, he was released and deported after serving approximately 6 years in prison.[54]



---

[53] *United States v. Samson Jolibois*, 1:13CR303 (LO), ECF. No. 28, Government's Position on Sentencing.
[54] *Find an Inmate*, FEDERAL BUREAU OF PRISON,
https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited June 27, 2024, 12 PM).



_United States v. Ricardo Arce III_, 21-cr-1044 (RB)

This case involved three defendants charged with the hostage taking of two foreign nationals. The defendants punched and kicked their victims, threatening to injure or kill them unless their families paid ransom. The defendants took videos of their brutal beatings and sent the videos to their victims' family members four times over a weeklong period. The families in total transferred almost $20,000 to the defendants.[56] The defendants received sentences of 32 months, 90 months, and 120 months, respectively.

_United States v. Adrian Acevedo_, 20-cr-493 (WJ)

This case involved multiple defendants charged in the hostage taking of two Cuban nationals. The defendants contacted the victims' families, making threats of continued detention

---

[55] ████████████████████████████████████████████████████████

[56] Aaron Martinez, Three arrested for allegedly kidnapping, torturing and extorting migrants in Chaparral, EL PASO TIMES (May 14, 2021), https://www.elpasotimes.com/story/news/crime/2021/05/14/chaparral-kidnapping-torture-extortion-allegedly-targets-migrants/5100275001/.

and violence to compel the families to pay ransom. The hostages were held overnight until they were rescued by local police. Adrian Acevedo and Willie Espinoza, the two main conspirators, were sentenced to 120 months and 63 months, respectively. Of note, Acevedo's 120-month sentence accounted for both his participation in the hostage taking and a later felony for harboring illegal aliens.[57]

### vii.    The cases the government cites as comparators are easily distinguishable.

In support of its request for a life sentence, the government cites a number of cases which involve far more aggravated conduct. For example, in *Martinez v. United States*, the defendant kidnapped a woman and her two children and held them hostage for *five days*. During the hostage taking, the defendant shot one of the children in the head and neck with a stun gun and threatened to kill the woman in front of her children. 853 Fed. Appx. 416, 416-417 (11th Cir. 2021). Mr. Delgado's case did not involve children or days long detention.

In *U.S v. Palmera Pineda*, the defendant was a member the Colombian guerrilla group, FARC. The defendant admitted that FARC regularly engaged in kidnappings to raise money to finance FARC's revolution. He participated in kidnapping three Americans after their plane went down and made political demands in exchange for their release. Hostage taking for political purposes is, according to the government "a quintessential act of terrorism." *United States v. Pineda*, 04CR232, Gov. Sent. Memo, ECF. No. 346. Of course, Mr. Delgado's cases did not involve political purposes. Yet, the government cites another politically motivated case, *United States v. Yunis*, in which the defendant participated in a Jordanian airplane hijacking to get

---

[57] *United States v. Adrian Acevedo*, 2:20CR493 (WJ), ECF. No. 22, Plea Agreement.

Palestinians to leave Lebanon. 924 F.2d 1086, 1090 (D.C. Cir. 1991). Mr. Delgado's case is not fairly compared to *Pineda* or *Yunis* either.

Nor is Mr. Delgado's case easily compared to *United States v. Tchibassa*, in which the defendant, a member of the Angolan "Front of the Liberation of the Enclave of Cabinda (FLEC) was sentenced to 24.5 years (293 months) for a sophisticated hostage taking for ransom. In *Tchibassa*, the defendant held the victim, an employee for a subsidiary company to Chevron, for over two months and forced the victim on a "several-day trek on foot to a FLEC base camp where he remained until moved to a second camp." 452 F.3d 918 at 921. Following extensive negotiations between FLEC and Chevron, the defendant and co-conspirators moved the victim from Angola to Zaire where the victim was ultimately released to Chevron executives in exchange for ransom. *Id*. Again, the government's cases miss the mark. In contrast to cases involving serious injury, and days—even months long—detentions and politically motivated cases, Mr. Delgado's case is more comparable to a series of Hobbes Act robberies. The defense does not diminish the seriousness of the offenses or the impact that the incidents had on the victims. That said, the cases the government do not serve as fair comparisons. Instead, the hostage taking cases cited by the defense support Mr. Delgado's request for a sentence of 10 years.

## Conclusion

For all the reasons herein, the Court should vary considerably from the grossly excessive sentence of life recommended by the Guidelines and the government. In light of the foregoing, a sentence of 120 months is sufficient but no greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

A. J. KRAMER

FEDERAL PUBLIC DEFENDER

 */s/ Kathryn D'Adamo Guevara*

Kathryn D'Adamo Guevara
Assistant Federal Defender
Office of the Federal Defender for Maryland
6411 Ivy Lane Suite 710
Greenbelt, MD 20770
(301)344-0500
Katie_guevara@fd.org

Elizabeth Mullin
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Elizabeth_Mullin@fd.org